PARIS MEDICINE CO. v. W. H. HILL CO. et al.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1900.)

No. 764.

1. UNFAIR COMPETITION—UNLAWFUL IMITATION OF NAME OR PACKAGE.

Where there are strong resemblances between the name or dress of the goods of defendant and complainant, for which no sufficient reason appears, the inference is that they exist for the purpose of misleading; and where they are of such a character as to deceive ordinary purchasers, in the exercise of ordinary care, they are sufficient to establish unfair competition. The fact that the dissimilarities are such that, if called to the attention of a purchaser, or if he were given an opportunity for comparison, he would not be deceived, is not a defense.

2. APPEAL—REVIEW—ORDER DENYING PRELIMINARY INJUNCTION.

The review on appeal of an order granting or denying a preliminary injunction is not as if the appeal was from a final decree upon the merits, especially where such order was based in large part upon conflicting affidavits; and, to justify its reversal, it must clearly appear that a mistake was made by the court below.

3. SAME—UNFAIR COMPETITION.

On an application for a preliminary injunction against the infringement by defendant of the name "Bromo Quinine," claimed by complainant as a trade-mark for a medicinal preparation, the court found, upon conflicting affidavits, that the word "bromo" was one of description, and was used by complainant for the purpose of inducing the belief in the public that bromine was a leading constituent in its compound, in which it was not in fact an ingredient, and that by reason of such facts complainant was not entitled to be protected in the exclusive use of the word as a trademark, or to relief in equity from unfair competition. *Held*, that such findings were not so clearly erroneous as to justify the reversal of an order, based thereon, denying a preliminary injunction.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

This is a bill in equity to restrain unlawful competition in trade, and the appeal is from a decree denying to the complainant a preliminary injunction. The motion for the injunction was heard upon the bill and certain affidavits and exhibits thereto, and upon counter affidavits filed by the defendant. The complainant is a corporation which since some time prior to 1893 has been engaged in the manufacture and sale of a medicinal preparation or remedy which is called "Bromo Quinine," or "Laxative Bromo Quinine," or "L. B. Q.," and which, it claims, has acquired a high reputation as a remedy for coughs, colds, and la grippe. It is averred that complainant first began the use of these names for its remedy, and that tne remedy, under these names, has acquired a wide reputation, and has been sold throughout the United States, Canada, and Europe in large and increasing quantities. Complainant does not disclose its formula, claiming that it constitutes a valuable trade secret; but it avers that it has expended more than $300,000 in introducing and establishing a demand for its preparation, and has adopted for it, not only a distinctive name, but a dress, by which it has become well known to the trade and· the consuming public. Complainant's preparation is put up and sold in small tablets, circular·in form, each being about three-eighths of an inch in diameter and one-eighth. of an inch thick. On one face of the tablet appears in relief the letters "L. B. Q." Twenty-five of these tablets are put up in a small pasteboard box. Upon the top, bottom. and sides of this box appears certain printed matter, printed partly in red and partly in black colors; thus making a distinctive dress and advertisement, best shown by the appearance of the box when opened out, as shown below:

Twelve of these small boxes are packed in a large box or carton, which is adapted to stand on the counter or show case; being provided with folding legs projecting from the box, so that the carton may be held in a vertical or slanting position. These cartons are made of white pasteboard, and are about 8½ inches long and 4½ inches wide. Upon their front face is contained certain lettering in red ink, of much the same general import as that upon the smaller boxes, in which the words "Laxative" and "Bromo Quinine" are particularly conspicuous.

The bill charges that the defendants, "in violation of complainant's rights, have caused to be made and sold, and are now causing to be made and sold, a medicinal preparation purporting to be of the same nature as complainant's, and for the same diseases, marked and called 'Bromide Quinine,' which said name is a colorable imitation of complainant's trade-mark and tradename, 'Bromo Quinine,' and is marked on the boxes and packages containing this preparation for the purpose of selling defendants' goods as and for the complainant's, with the object and result of deceiving the public into buying defendants' product as and for complainant's, for the purpose and in order that the defendants may sell their production on the reputation of complainant."

The defendants' preparation is also made into small tablets, greatly resembling, in size, shape, and color, the tablets of the complainant, and across the face of each tablet is impressed the raised letters "W. H. H." These tablets are placed in small paper boxes, having a general similitude to those used by complainant. Upon the top, bottom, and sides of this box is certain printed matter, best shown by the following fac simile of defendants' box opened out:

Twelve of these small boxes are placed in a larger pasteboard carton, adapted to stand in a vertical position. Upon this carton is printed in lettering of chocolate color a part of the most striking and "taking" parts of the printed matter on the smaller boxes; the words "Cascara" and "Bromide Quinine" being particularly conspicuous.

The court below, upon a comparison of the tablets, boxes, and cartons made and used by the rival makers, reached the conclusion that there was "no such similarity as would deceive the public or those accustomed to using complainant's remedy." In respect to the use of the words "Bromide Quinine" as a substitute for "Bromo Quinine," the court held: First. That "bromo," in chemical compounds, was well known as indicating the presence of bromine as its principal element, and that "its use by complainant was obviously intended to imply that bromine was a leading constituent in the compound which it made and sold, and the prefix 'bromo' was evidently used for the purpose of inducing that belief in the public, and affirms the presence of that ingredient in the preparation." Second. That "bromo" is not an ingredient in the complainant's remedy. Third. That the right of the complainant to be protected in the exclusive use of that word as a trade-mark, or against its use in the alleged unfair competition of defendants, should be denied, because "complainant, being engaged in deceiving the public by false representations as to the ingredients of its compound, has no more right to protection in a court of equity against unfair competition than it has to a monopoly in the use of the word 'bromo,' which is a descriptive word." A temporary injunction was therefore denied, chiefly upon the ground that "bromo" was a descriptive word, which complainant used deceptively.

Paul Bakewell, for appellant.

A. C. Lightner and C. F. Burton, for appellees.

Before LURTON, Circuit Judge, and SEVERENS and THOMPSON, District Judges.

LURTON, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

It must be admitted that the resemblances between the trade-name and dress of the rival preparations here involved are numerous and striking. There are differences between their packages, including differences in the colors of the lettering thereon, but the differences are less observable than the resemblances. An intentional infringer is never likely to make his packages exactly like that of the tradesman whose trade he proposes to steal. To avoid the consequences of infringement, an intentional infringer will usually take care that there are plenty of what Judge Lacombe, in Scheuer v. Muller, 20 C. C. A. 161, 74 Fed. 225, 228, called "arguable differences," to stand upon when brought into court, but resemblances to the article he desires to imitate sufficient to deceive the average purchaser into buying the simulated article as and for the goods of another. Speaking of the infringement of a trade-mark, Justice Cotton, in Tea Co. v. Herbert, 7 Eng. Rep. Patents & Trade-Mark Cas. p. 183, said:

"Of course, when one person imitates another's mark, he never takes it absolutely in all points. If so, there is no question. But there is always a similarity and dissimilarity, in order that he may say, 'If you look at the marks carefully, you will see such a difference that you cannot be deceived.' Of course, when you are told that there are two marks, and the differences pointed out, or they are put before you so that you can see the differences, then in that case you might say there is hardly any probability of deception; but, when one only is shown, there are certain incautious purchasers who would probably be deceived by the similarities which exist, the articles being the same."

When there are found strong resemblances, the natural inquiry for the court is, why do they exist? If no sufficient answer appears, the inference is that they exist for the purpose of misleading. Taylor v. Taylor, 2 Eq. Rep. 290. We are to remember that the average purchaser has seldom the opportunity of making a close comparison; that he is apt to act quickly, and is therefore not expected to exercise a high degree of caution. Pillsbury v. Flour-Mills Co., 12 C. C. A. 432, 64 Fed. 841.

In McLean v. Fleming, 96 U. S. 245, 255, 24 L. Ed. 832, the court said:

"Difficulty frequently arises in determining the question of infringement, but it is clear that exact similarity is not required, as that requirement would always enable the wrongdoer to evade responsibility for his wrongful acts. Colorable imitation, which requires careful inspection to distinguish the spurious trade-mark from the genuine, is sufficient to maintain the issue, but a court of equity will not interfere when ordinary attention by the purchaser of the article would enable him at once to discriminate the one from the other. Where the similarity is sufficient to convey a false impression to the public mind, and is of a character to mislead and deceive the ordinary purchaser, in the exercise of ordinary care and caution in such matters, it is sufficient to give the injured party a right to redress, if he has been guilty of no laches."

The general resemblance between the names "Bromo Quinine" and "Bromide Quinine" is very striking. The words "Bromo Quinine" catch the eye and fasten themselves in the memory, and, as the name of the remedy, become easily known and recognizable. The difference between "Bromo Quinine" and "Bromide Quinine" is slight, and not likely to attract the attention of the average public. It is true that complainant uses the word "Laxative" as a prefix, but that is a word indicative of a therapeutic effect. The defendants have substituted "Cascara" as a prefix, that being a drug widely and generally known as one of the best laxatives. Here, again, is both a resemblance and a difference, by which the literalness of imitation is avoided, while the laxative property of the defendants' "Bromide Quinine" is called to the attention of the public.

But is the complainant entitled to prevent the defendants from using the words "Bromide Quinine," as a trade-name greatly resembling that of complainant? The defendants say that they use the name "Bromide Quinine" as descriptive of the ingredients of their remedy, and for the purpose of telling the truth. But the chemical analysis made of their tablets show but the barest trace of bromine,— not enough to have the slightest therapeutic effect. The court below thought, however, that the presence of even a trace gave a color of truthfulness to the use of the word "Bromide." If the fact be, as shown by the affidavits, that defendants do not use "Bromide Quinine," and that the trace of bromine in their preparation can have no possible medicinal effect in the doses intended to be taken, it is a fact tending to show that the use of so infinitesimal a quantity was intended to justify the use of a word in their trade-name for the purpose of not only misleading the public into the belief that bromine was a leading element in their preparation, but to also justify the use of the same word against the trade-name of complainant. Such a device was resorted to in the case of California Fig-Syrup Co. v. Fred-

erick Stearns & Co., 20 C. C. A. 22, 26, 73 Fed. 812, 33 L. R. A. 56; but this court regarded the device as not altering the legal effect of the fact that the syrup advertised and sold was a syrup of senna, and not of figs. Complainant, on the other hand, urges that its prefix, "Bromo," is a coined word, and is not descriptive. The court below took judicial notice of a definition of "bromo" found in the Standard Dictionary, where it is stated that the word is "derived from bromine," and is "a combining word used mostly in names of chemical compounds in which bromine is a principal element." Upon this definition and certain affidavits filed by defendants, made by chemists, of the same general tenor, the court reached the conclusion that the trade-name of the complainant was descriptive, and that complainant, by its use, intended to affirm that bromine was a leading constituent in its remedy. The court below also found, upon the strength of certain affidavits purporting to state the results of chemical analysis made for defendants of the tablets of the complainant, that its tablets contained no bromine whatever. Upon these considerations the court reached the conclusion that, upon the showing made, the complainant's trade-name was descriptive, and therefore not the subject of a technical trade-mark, and that complainant was not entitled to protection against a use of the same name by the defendants, because it was a descriptive name used descriptively. Whether the word "bromo" has or has not acquired a definite significance as a term of science, indicating a compound in which bromine is an element, is a matter upon which this court is not clear, and is therefore reluctant to disturb the order denying to complainant a temporary injunction. There is no finding and no proof as to whether there is known, either in chemistry or medicine, such a compound as "bromo quinine." In the case of Keasbey v. Chemical Works, 142 N. Y. 467, 37 N. E. 476, the trade-name "Bromo Caffein" was protected as a trade-mark; the court, after elaborate consideration, holding that the name was arbitrary and fanciful, and was not so descriptive "as to impart information as to the general characteristics and composition of the plaintiff's preparation" to such an extent as to make the trade-mark invalid because descriptive. If the word "bromo" is not descriptive, in the sense that it affirms the presence of a particular and known drug in complainant's preparation, and could therefore be the subject of a valid trade-mark in association with the word "quinine," it is difficult to see how its use can be regarded as so misleading and deceptive as to exclude complainant from the doors of a court of equity. In California Fig-Syrup Co. v. Frederick Stearns & Co., 20 C. C. A. 22, 25, 73 Fed. 815, 33 L. R. A. 57, the term "Syrup of Figs" was held by this court to be plainly and distinctly descriptive of a syrup "in which the medicinal quality of the fig is the active and chief element." It was also found from the facts of that case that the complainant intended that the public should understand that the name was used in this descriptive sense. The court below, upon the evidence, reached the conclusion that the word "bromo" was also a word of description, and that the complainant, by its use, intended the public to understand and believe "that bromine was a leading constituent in the compound which they made

and sold"; thus bringing the case within the rule applied in the Fig-Syrup Case. In Proctor & Gamble Co. v. Globe Refining Co., 34 C. C. A. 405, 406, 92 Fed. 357, this court refused to reverse the action of the court below in denying a temporary injunction, upon the ground that it was not so plainly apparent that the court below had made a mistake as to justify a reversal of its action in a matter in which much must be left to the discretion of the court below. The trial of the question, upon appeal from an order granting or denying a preliminary injunction, especially when the action of the court below was based in large part upon conflicting affidavits, is not as if the appeal was from a final decree upon the merits. In the case cited above, this court, speaking by Judge Severens, said:

"This being an appeal from an order denying a preliminary injunction, the question to be determined is whether the discretion of the court below was improvidently exercised, and not whether, upon the final hearing, upon full view of all the facts in the case, this court would, upon the evidence before it, reach the same conclusion as that of the court below. Duplex Printing-Press Co. v. Campbell Printing-Press & Mfg. Co., 16 C. C. A. 220, 69 Fed. 252; Garrett v. T. H. Garrett & Co., 24 C. C. A. 173, 78 Fed. 472. To justify this court in reversing an order of this kind, it must be quite clearly apparent that a mistake was committed by the court below. Ritter v. Ulman, 42 U. S. App. 263, 24 C. C. A. 71, 78 Fed. 222."

The ruling of Judge Swan, who heard this case in the court below, was based upon certain conclusions of fact, already stated, drawn from conflicting ex parte affidavits. In this situation of the case, we are not so clearly convinced that there has been such a plain error as to justify a reversal. The decree will therefore be affirmed.