H. E. WINTERTON GUM CO. v. AUTOSALES GUM & CHOCOLATE. CO.

(Circuit Court of Appeals, Sixth Circuit. February 4, 1914.

No. 2535.

1. TRADE-MARKS AND TRADE-NAMES (§ 70*)—UNLAWFUL COMPETITION—COM-
PETING GOODS—DISTINCTIVE DRESS.

Complainant and its predecessors manufactured and sold gum cut in
disks called "Violet Chips" and "Mint Chips," put up in enameled round
tin boxes, the violet in violet colored boxes and the mint in green. The
lettering on both was in white with the words "Colgan's Violet Chips—
The Gum That's Round." This gum was largely sold in the south and
southwest and was put up in pasteboard cartons colored to correspond
with the boxes and prominently marked on the cover which was provided
to be left open, with the same lettering. In 1912 defendant began put-
ting out a round gum called "Winterton's Satsuma Chips," adopting a
box of the precise shape, size, and form of that used by complainant,
using a light blue and red color, respectively, and the words "Winter-
ton's Satsuma Chips—A Dainty Box for the Purse," in white in the
same positions on the box as complainant's legend. Defendant's gum
was sold in competition with complainant's at a less price to the retailer,
and after objection, and shortly before suit brought, defendant changed
the name of its gum from "Chips" to "Wafers" and adopted different col-
ors for the boxes and cartons, which were otherwise practically the same.
Held, that defendant was guilty of unlawful competition in the dress of its
gum considering the prior trade, and complainant was entitled to an in-
junction restraining defendant from using boxes or containers which
might be of sufficient similarity to mislead the ordinary purchaser and
also from using the words "Satsuma Wafers."

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent.
Dig. § 81; Dec. Dig. § 70.*]

2. TRADE-MARKS AND TRADE-NAMES (§ 70*)—UNLAWFUL COMPETITION—DIS-
TINCTIVE DRESS.

A manufacturer of goods may obtain a monopoly in the right to use a
distinctive dress for boxes and cartons containing the goods which have
become known to the public by advertising as characterizing the manu-
facturer's product, which monopoly will be protected against unlawful
competition.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent.
Dig. § 81; Dec. Dig. § 70.*

Imitation or simulation of trade-mark or trade-name as unfair com-
petition, see note to John H. Rice & Co. v. Redlich Mfg. Co., 122 C. C. A.
447.]

3 TRADE-MARKS AND TRADE-NAMES (§ 70*)—DISTINCTIVE WORDS—USE.

While the word "Chips" as applied to disks of chewing gum is a de-
scriptive word which may not be exclusively appropriated by a manu-
facturer, yet, having been appropriated, a competitor may not use the
word as describing its goods in connection with other words, and such
a form of dress as will mislead the public to believe that its chips are
complainant's product.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent.
Dig. § 81; Dec. Dig. § 70.*]

4. TRADE-MARKS AND TRADE-NAMES (§ 70*)—UNLAWFUL COMPETITION—DRESS
OF GOODS—COLOR.

Color may be one of the elements making up a dress of goods entitled
to protection against unlawful competition.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent.
Dig. § 81; Dec. Dig. § 70.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. TRADE-MARKS AND TRADE-NAMES (§ 70*)—UNLAWFUL COMPETITION—RIGHT TO RELIEVE—ULTIMATE PURCHASER.

In order to obtain relief against unlawful competition, it is not necessary that the imitation be such as to mislead the careful and discriminating purchaser, but it is enough if it is calculated to mislead the ordinary and casual buyer.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. § 70.*]

6. TRADE-MARKS AND TRADE-NAMES (§ 89*)—UNLAWFUL COMPETITION—FRAUD.

While a manufacturer is not responsible for the fraud of a retailer of his goods, the manufacturer is guilty of unlawful competition if he so dresses his goods as to represent the goods of another and assists the retailer in palming off his goods as those of the competitor.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 99; Dec. Dig. § 89.*]

7. APPEAL AND ERROR (§§ 728, 760*)—ASSIGNMENTS OF ERROR—REVIEW.

Where assignments of error as to the admission of evidence did not quote the substance of the evidence as required by Court of Appeals Rule No. 11 (202 Fed. viii, 118 C. C. A. x), and appellant's brief does not refer to the pages of the record where the action complained of was to be found as required by rule No. 20, subd. 2 (202 Fed. xiv, 118 C. C. A. xvi), and contained no argument in support thereof, the assignments would not be considered.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3010–3012, 3095; Dec. Dig. §§ 728, 760.*]

Appeal from the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

Suit by the Autosales Gum & Chocolate Company against the H. E. Winterton Gum Company. Decree for complainant, and defendant appeals. Affirmed.

Elias Gates, of Memphis, Tenn. (Lehman, Gates & Martin, of Memphis, Tenn., of counsel), for appellant.

A. A. Thomas, of New York City, for appellee.

Before KNAPPEN and DENISON, Circuit Judges, and DAY, District Judge.

KNAPPEN, Circuit Judge. This is an appeal from an interlocutory decree awarding injunction and accounting in a suit for unfair competition.

[1] The important facts are these: In 1897 the Colgan Gum Company began manufacturing paper-wrapped chewing gum. In 1908 it began making a brand of gum in the form of thin disks or chips; its first variety being violet-flavored and called "Violet Chips," its second variety (put out in 1909) being mint-flavored and called "Mint Chips." The company adopted in 1908 a distinctive package in the form of a round, enameled, and lithographed tin box, about $11/16$ inches deep and with a cover about $1\frac{1}{2}$ inches in diameter, containing 10 disks, and retailing at 5 cents. The Violet Chips were contained in violet-colored boxes and the Mint Chips in boxes colored green. The lettering upon both boxes was white. Upon the covers of the boxes containing Violet Chips were the words "Colgan's Violet Chips—The Gum That's Round"; the latter four words being in the form of a circle on the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

margin of the lower half of the cover-top. The Mint Chip boxes had the same legend, using, however, the word "Mint" instead of "Violet." There was other printing upon the bottom of the boxes and on the rim of the cover. The Colgan Company was not the first to manufacture gum in the form of disks, but it was the first to put out "round gum" in round tin boxes, and at the time its manufacture began it was the only manufacturer of round gum. The Faultless Chemical Company had for a few years put out what it called "Chips," its package being a rectangular pasteboard box; at least one form of its advertisement carrying the legend, "The gum that's round." The Faultless Company ceased manufacturing gum as early as 1900, and its round-gum cutting machines were in 1907 sold to the Colgan Company, in preparation for its manufacture of round gum. One Primley manufactured a round gum from about 1893 to 1896, when he ceased. His disk was of considerably larger diameter than Colgan's, and was packed in gold-colored pasteboard boxes and called "Primley's Goldbox Gum." The Faultless Company and Primley seem to have been the only ones manufacturing round gum previous to Colgan's taking up that form. The Colgan Company sold out its business to complainant (appellee) May 15, 1911, and the latter has continuously sold (among other gums) the Violet and Mint Chips of the same diameter and form, in precisely the same kind of a package, and lettered in precisely the same way, except as respects certain details on the bottom of the box not material here—latterly putting 7 disks in a box.

From 1908 until approximately June, 1911, the Colgan Gum Company expended in advertising Colgan's "Chips" about $250,000, by means of magazine and newspaper advertisements, billboards, window displays, hangers, counter display stands, sample distribution, and otherwise; and complainant, from May 15, 1911, to March 31, 1913, expended in advertising the same product, in ways similar to those employed by the Colgan Company, more than $180,000. The advertising matter of both complainant and Colgan generally contained prominent pictorial representations of the boxes or containers, or both. From the time they were put on the market until January 1913 the sales of Colgan's Violet and Mint Chips have amounted to about $1,-750,000. The counter display stands put out by the Colgan Company and complainant were of enameled metal, consisting of five upright compartments, each adapted to hold four boxes of chips; the stand containing, among other lettering, the words "Colgan's Chips" prominently displayed, together with the words "The Gum That's Round," printed in color on a white circular surface, the character "5c" being in the center of the circle. Colgan's Chips were delivered to the retailer in distinctive pasteboard cartons, each holding 20 boxes, the cartons being colored to correspond with the boxes they contained, and being prominently marked on the cover (which was provided to be left open) "Colgan's Mint Chips" (or Violet Chips, as the case might be) "The Gum That's Round"; the lettering throughout on the cartons being white and having conspicuously displayed on each side and each end of the carton the words "The Gum That's Round," contained within a circle, in connection with the words "Mint Chips" or "Violet

Chips," the circle on the ends of the cartons being between the two words forming the name of the Chips. The principal sales of Mint Chips and Violet Chips (both of Colgan and complainant) were in the south and southwest parts of the United States, and in some sections largely to Negroes, Italians, and French. Customers were in the habit of calling for and ordering these chips by the names "round gum," "tin box gum," or "tin gum."

About the middle of the year 1912 defendant began putting out a round gum, which it called "Winterton's Satsuma Chips." It adopted a box of the precise shape, size, and form of that used by Colgan and complainant, even to the slight depression in the cover of the box, which left more or less of a rim on the upper surface; defendant's box contained from 7 to 11 chips. Defendant also enameled its boxes, using two different colors, a light blue and red, respectively; the gum, however, contained in the different colored boxes being apparently the same, including flavor. Defendant also lettered its boxes in white, the inscription upon the top of the box being "Winterton's Satsuma (Trade-Mark) Chips. A dainty box for the purse"; the word "Chips" being printed in a distinctive style similar to that word as printed upon complainant's Violet Chip boxes, and the words "A dainty box for the purse" occupying the same position as complainant's legend "The Gum That's Round." Defendant likewise packed its "Chips" for the use of the retailer in pasteboard cartons, the blank being apparently cut from the same pattern as complainant's, even to the ears attached to the cover for the purpose of holding it up when the box is open. Defendant's cartons thus contained the same number of boxes as did complainant's, and were likewise colored to correspond with the color of the enameled tin boxes contained therein, and likewise had a circle in white prominently displayed on the cover, the sides, and ends of its cartons, in the same relation to the words "Satsuma Chips" as complainant's circle occupied toward the words "Violet Chips" or "Mint Chips"; the legend within defendant's circle being "Satsuma—That Regular Make," so arranged that the word "That" is prominently and alone in the exact center of the circle, as is the word "That's" in the circle of complainant and Colgan.

Defendant has spent comparatively little in advertising its product in question, its total outlay for all advertising purposes, including free gum, being from $6,000 to $8,000. It has done no pictorial advertising, and but little in trade journals or other periodicals. Its goods have been sold through traveling salesmen in the territory occupied by complainant, and apparently in large part upon the strength of the popularity of complainant's chips. Since the advent of defendant's chips, complainant's sales have been appreciably affected in some localities; and a part of this interference seems fairly traceable to the competition of defendant, whose boxes being of the same size and shape, and at a distance of a few feet presenting the same general appearance as those of complainant (although actually differing in color and otherwise), could be, and in some instances are shown to have been, put in and sold from complainant's display standards and jars, mixed with boxes of complainant's chips. The fact that de-

fendant's chips were sold to the retailer at a lower price than complainant's, although sold to the consumer at the same price, would naturally offer temptation to the retailer to confuse the two manufactures.

After suit was threatened, and during the last days of November, 1912, defendant formally discontinued the use of its cartons and containers, as well as the name "Satsuma Chips," protesting, however, that such discontinuance was only temporary; and about six weeks later, and shortly after this suit was begun, began putting out the same product and in the same style of package, except that the name was changed from "Chips" to "Wafers," the words "A dainty box for the purse," formerly printed on the cover, being omitted; and the position and style of type in the word "Wafers" differing from the position and type of the word "Chips" in the former label. The colors adopted were a shade of tan and a slightly different shade of blue. An amended and supplemental bill was filed to meet the new situation. The decree enjoined defendant specifically from manufacturing and putting out chewing gum in round packages of the shape, style, and appearance of either defendant's "Satsuma Chips" or "Satsuma Wafers" boxes, as well as in defendant's pasteboard cartons; and generally from manufacturing and putting out chewing gum in colored round metal packages or pasteboard boxes, or under labels, substantially identical with or like complainant's boxes, packages, and labels, or such as are calculated to deceive purchasers or consumers. Defendant does not assign error upon the specific enjoining of the use of its "Satsuma Chips" boxes and cartons, but does complain that it is adjudged guilty of unfair competition and of the general features of the injunction, as well as the specific enjoining of the use of "Satsuma Wafers" boxes and packages.

[2] We think the court rightly found unfair competition, and rightly enjoined the use of defendant's "Satsuma Chips" boxes and containers, despite defendant's disclaimer of intention to resume the use of that label. The injunction properly extended to the use of any boxes, containers, or labels likely to mislead the public by creating confusion between the two manufactures. The question whether complainant can acquire, broadly speaking, a monopoly of the right to use a round, tin, lithographed box is not here involved; the decree need not rest upon the theory of such monopoly. The dress of complainant's boxes and cartons, taking all their features into account, is, in our opinion, distinctive; and this distinctive dress has become known to the public as characterizing complainant's product. This dress is therefore entitled to protection against unfair competition. Paris Medicine Co. v. W. H. Hill Co. (C. C. A. 6th Cir.) 102 Fed. 148, 42 C. C. A. 227; Wm. Wrigley, Jr., & Co. v. Grove Co. (C. C. A. 2d Cir.) 183 Fed. 99, 101, 105 C. C. A. 391; Moxie Co. v. Daoust (C. C. A. 1st Cir.) 206 Fed. 434, 124 C. C. A. 316; Samson Cordage Works v. Puritan Cordage Mills, 211 Fed. 603, decided by this court January 6, 1914.

[3] It is true that the word "Chips" is a descriptive term, and (unless it has acquired a secondary meaning, which we are not called up-

on to decide) could not be exclusively appropriated. But while defendant had the right to use the word as describing its goods, it had not the right to so use it in connection with other words and form of dress as to induce the public to believe that its "Chips" are complainant's product. Wm. Wrigley, Jr., & Co. v. Grove Co., supra, 183 Fed. at page 101, 105 C. C. A. 391. The rule in trade-mark cases, that color, except in connection with some definite, arbitrary design, cannot be the subject of exclusive appropriation (Leschen Rope Co. v. Broderick, 201 U. S. 166, 171, 26 Sup. Ct. 425, 50 L. Ed. 710; Samson Cordage Works v. Puritan Cordage Mills, supra, and cases there cited), has little application here; where the pivotal question, so far as it affects that feature, is the existence or nonexistence of deceptive similarity.

[4] That color may be one of the elements making up a dress entitled to protection is clear. Coca-Cola Co. v. Gay-Ola Co. (C. C. A. 6th Cir.) 200 Fed. 720, 724, 119 C. C. A. 164. We are unable to resist the conclusion not only that the dress of defendant's "Satsuma Chips" boxes and cartons inevitably tends to confuse defendant's "Chips" with complainant's product, having in mind the conditions under which the two products are sold, but that the dress employed by defendant was adopted with the intent thereby to profit from the popularity of complainant's product and the latter's good will. It is true that the differences in coloring and lettering are such that the careful and discriminating purchaser, able and willing to read and seeing the two products side by side, need not be misled into accepting defendant's product for that of complainant; but the record suggests that not all of complainant's customers are able to read English at least, that the conspicuous characteristic in the minds of many purchasers is the round gum in the tin box, and that a casual observation of the differences in coloring and lettering of complainant's boxes would not suggest to the ordinary purchaser the distinction between the two products.

[5] It need scarcely be said that it is the ultimate purchaser whose deception is to be guarded against; that the imitation need not be such as to mislead the careful and discriminating purchaser. It is enough that it misleads the ordinary and casual buyer. Coca-Cola Co. v. Gay-Ola Co., supra, 200 Fed. at page 723, 119 C. C. A. 164; Cordage Works v. Cordage Mills, supra, and cases there cited.

[6] It is urged that defendant is not responsible for the fraud of the retailer; and this is true where such fraud is not encouraged by the defendant, and where the latter has done its legal duty in distinguishing its product from that of its competitor. Rathbone, Sard & Co. v. Champion Steel Range Co. (C. C. A. 6th Cir.) 189 Fed. 26, 33, 110 C. C. A. 596, 37 L. R. A. (N. S.) 258. But in our opinion defendant has not brought itself within this limitation.

Whether defendant's "Satsuma Wafers" boxes and cartons unfairly compete presents a somewhat different question, but we think different only in degree. If the consideration of these boxes and cartons could be dissociated from the previous use of and experience with defendant's "Satsuma Chips" boxes and containers, we might hesitate to find sufficient misleading similarity to justify a conclusion of unfair

competition. But this dissociation cannot properly be made; defendant seems to have gained a foothold with the trade through the use of its "Satsuma Chips" boxes and containers; presumably the latter were still kept in stock to some extent by some dealers at the time Satsuma Wafers were put out; and, in view of the history we have stated, we are impressed that the differences between "Satsuma Wafers" and "Satsuma Chips" boxes are not such as sufficiently to distinguish the former from complainant's "Chips" to prevent the misleading of the ordinary buyer. In many cases the use of the manufacturer's name is sufficient to prevent confusion, but there is no hard and fast rule to this effect. Gaines v. Turner-Looker Co. (C. C. A. 6th Cir.) 204 Fed. 553, 556, 123 C. C. A. 79. The question of deceptive similarity is, after all, one of fact, to be determined in each case upon its own peculiar incidents.[1]

[7] The record contains several assignments of error addressed to the overruling of objections and to the reading of portions of depositions of certain witnesses. These assignments are not discussed in appellant's brief, beyond the statement that they "are submitted for the consideration of the court on the reasons assigned in the objections to the evidence and without further argument on our part." They are not discussed in appellee's brief. We nowhere find any reference to the pages of the record where the action complained of is to be found, as is required by subdivision 2 of Rule 20 of this court (202 Fed. xiv, 118 C. C. A. xvi); nor is the substance of the admitted evidence quoted in the assignments, as required by our rule No. 11 (202 Fed. viii, 118 C. C. A. x). We should not be called upon to search the record for this purpose, and so cannot consider the assignments. Chicago Gt. Western Ry. Co. v. Egan (C. C. A. 8th Cir.) 159 Fed. 40, 46, 86 C. C. A. 230.

The judgment of the District Court is affirmed, with costs.

---

[1] Note.—Defendant's corporate name was printed on the bottom and on the cover rim of its Satsuma Chips box, on the side only (below the cover rim) of its Satsuma Wafers box, and on the top of its cartons; in each case in less conspicuous position and type than its trade-name.