**PARIS MEDICINE CO. v. BREWER &
CO., Inc.**

**No. 3990.**

District Court, D. Massachusetts.

Nov. 23, 1936.

W. Keane Small, of St. Louis, Mo., and George P. Dike, Cedric W. Porter, and Dike, Calver & Gray, all of Boston, Mass., for plaintiff.

Albert E. Fay and Southgate, Fay & Hawley, all of Worcester, Mass., Claude R. Branch and Choate, Hall & Stewart, all of Boston, Mass., and Frank C. Smith, Jr., and Thayer, Smith & Gaskill, all of Worcester, Mass., for defendant.

BREWSTER, District Judge.

In this suit the plaintiff charges the defendant with infringement of registered trade-marks and unfair competition.

The defendant attacks the validity of the trade-mark, denies infringement and unfair competition, and urges the impropriety of granting equitable relief because of laches and also because the plaintiff comes into court with unclean hands.

The case was submitted wholly upon depositions and written briefs upon the facts and the law. In view of observations of attorneys in the briefs, I would assure them that I have carefully read all of the depositions except that part deleted under order of court.

## Statement of Facts.

1. The plaintiff is a Delaware corporation, organized in 1919. It succeeded to the assets and business of the Paris Medicine Company, a Tennessee corporation organized in 1899. The Tennessee corporation in turn succeeded to the business of the Paris Medicine Company, a Missouri corporation. Since the bringing of the suit, the name of the plaintiff corporation has been changed to Grove Laboratories, Inc.

2. All of these corporations were engaged, and the plaintiff still is engaged, in manufacturing and selling proprietary remedies. Among its products was a tablet known as "Laxative Bromo Quinine," which was a medicinal tablet for the relief of colds, coughs, headaches, and la grippe.

It has not been affirmatively established when the plaintiff's predecessors first began the manufacture of this tablet. There is evidence that as early as 1902 the Tennessee corporation was manufacturing the tablets and using the trade-marks and labels hereafter referred to. It is a fair inference that the statements of the plaintiff and its predecessors, filed in connection with trade-mark registrations, to the effect that the trade-mark had been in continuous use since 1893, are approximately correct. It is not possible to determine from the evidence in what quantities they were manufactured, or how widely they were distributed in the trade, prior to 1902. There can be no doubt that, at the time of bringing this suit and for some years prior thereto, plaintiff had a wide market for its products including the cold tablet.

The size, type, and shape of boxes in which the tablets were sold were similar to containers used by many other manufacturers of similar products. The label used by plaintiff was distinctive, as will later appear. With the possible exception of immaterial changes in the printed matter on the labels, the label now in use by the plaintiff has the same appearance as those which have been continuously in use since 1902.

I find that, before the defendant's predecessor entered the field, the plaintiff's predecessor was using the initials "L. B. Q." embossed upon its tablets, and was using labels substantially similar to those now employed by it.

3. The history of the trade-marks registered by the plaintiff and its predecessors is as follows:

In 1894 L. W. Grove undertook to register as a trade-mark the words "Bromo

Quinine." He failed in this because the words were descriptive and could not be adopted as a legal trade-mark, and, furthermore, since the tablets at that time contained no bromide, the words were not only descriptive but were also deceptive.

In 1897 the words "Laxative Bromo Quinine" and the letters "L. B. Q." were registered by the Missouri corporation. This registration was declared invalid in Paris Medicine Co. v. W. H. Hill Co. (C. C.A.) 102 F. 148, as being both descriptive and deceptive.

In 1898 the Missouri corporation, and in 1899 the Tennessee corporation, registered as a trade-mark the letters "L. B. Q." inclosed in a circle. According to the statement accompanying the applications, the distinctive feature was the letters "L. B. Q.," usually arranged as shown in the accompanying facsimile in which is shown an elevation of a lozenge, or tablet, the letters "L. B. Q." appearing thereon surrounded by a circle. The trade-mark was applied to the tablet by pressing the compound and producing the letters either in elevation or in depression. The trade-mark was also used in the advertising matter and office stationery.

In 1905 the Tennessee corporation registered as a trade-mark the words "Laxative Bromo Quinine," the letters "L. B. Q." in a circle, and the signature "E. W. Grove." This trade-mark was intended for use on the labels on the boxes in which the tablets were put up.

It was not until 1933 that the letters "L. B. Q." alone were registered as a trademark for use on such labels. In the same year also the plaintiff filed with the Secretary of the Commonwealth of Massachusetts a trade-mark comprising the spaced letters "L. B. Q." in connection with its medicinal tablets.

4. About 1901 Billings Clapp Company, a manufacturer of proprietary medicines, made and sold a tablet for the relief of colds, headaches, and la grippe. This tablet in shape, size, and color resembled the plaintiff's and was known to the trade as "Laxative Phospho Quinine." The color of the tablets is natural and is due to the presence of gamboge, the laxative ingredient in the tablet. These tablets carried the embossed letters "L. P. Q." and were put up in boxes of the usual size and shape. These boxes carried two labels, one used when the tablets were sold under the name "Billings Clapp Company," and the other when sold under the name of the customer, or with the so-called "customer's imprint."

In 1911 Brewer. & Co., a partnership, purchased from Billings Clapp Company its tangible assets, good will, trade-names and trade-marks, formulas, and the right to use the name "Billings Clapp Company." While the Billings Clapp Company proceeded to collect in its receivables, and to liquidate, it nevertheless sold its business of manufacturing proprietary medicines as a going concern, and the ownership of the trade-marks passed to the purchaser. Billings Clapp Company had succeeded in establishing a wide market for its tablets, and immediately upon the transfer of its business to Brewer & Co. orders were received from all the New England States, and several of the Midwestern States, which were received by Billings Clapp Company and turned over to Brewer & Co., the latter company filling the orders.

In 1918 Brewer & Co. (partnership) transferred its assets and business to the defendant corporation which succeeded to all the good will, rights in trade-mark and trade-names which the partnership had previously acquired from Billings Clapp Company, and the partnership and the defendant corporation continued to use, in connection with the business of selling its Laxative Phospho Quinine tablets, the labels which had been used by Billings Clapp Company.

The defendant also manufactures a cold tablet under the name of "Laxan" which contains the same ingredients as its Laxative Phospho Quinine tablets. These tablets are sold in bulk and are plain, without any letters being embossed or depressed upon them.

5. There is no confusing similarity in the appearance of the labels of plaintiff and defendant. The distinctive features of the plaintiff's label are the words "Laxative Bromo Quinine" in black and red, the signature "E. W. Grove, Inventor," in black, and the letters "L. B. Q." in a circle in black.

The distinctive feature of the label used by the defendant on boxes other than customer's imprint are the words "Laxative Phospho Quinine" in blue and red type imposed upon a green coat of arms, with the letters "L. P. Q." distributed around it in green. The letters "L. P. Q." on this label are not prominently featured.

The distinctive features of defendant's packages showing the customer's imprint are the letters "L. P. Q." in white imposed

upon a yellow background, and the words "Laxative Phospho Quinine" in black imposed upon a green eagle.

6. The plaintiff introduced evidence from which I find that an unscrupulous druggist in New York purchased from the defendant some of its "Laxan" tablets and sold them under his own labels, which simulated to some extent plaintiff's labels. Some of these represented the tablets as "Laxative Bro-Quinine" with the letters "L. P. Q." inclosed in a circle. While a reasonably careful comparison of this package with the plaintiff's would at once disclose marked dissimilarity, this druggist did not hesitate to palm off, whenever he could, his Bro-Quinine for Grove's Bromo Quinine. In fact, his mendacity extended to the granting of extra compensation to clerks who were successful in making the substitution. There is no credible evidence, however, that the defendant, nor any one representing the defendant, was aware of the trickery of this druggist. There was no evidence tending to show that the public was otherwise misled into buying the defendant's product in the belief that it was buying the plaintiff's product.

The record is barren of any evidence that any one purchased the defendant's tablets, contained in its own package, under the mistaken belief that he was buying plaintiff's tablets. The evidence goes no further than to prove that customers were misled only when the Laxan tablets were sold in packages, dressed-up in labels pro-vided by a dishonest retailer which packages he intentionally devised to simulate plaintiff's packages in order to render substitution easy.

There is no evidence entitled to weight that the defendant intended or suggested that its tablets should be palmed off for those of the plaintiff. Whether the name "Laxative Phospho Quinine" or the initials "L. P. Q." were conceived and adopted by Billings Clapp Company with any intent to ride upon the reputation of plaintiff's product is purely a matter of speculation. The evidence falls short of sustaining the plaintiff's allegation respecting the fraudulent character of the use by the defendant of the name and initials.

One of the controversies between the parties was as to the extent to which the plaintiff's product was known as "L. B. Q." tablets. From printed stationery, used by the plaintiff, the tablet was referred to as "Laxative Bromo Quinine" tablet, but frequently orders received by telegram, and sometimes by letter, designated them as "L. B. Q." tablets. It is reasonable to infer that in the trade plaintiff's product was not only identified by the words "Laxative Bromo Quinine" but also by the letters "L. B. Q."

It is quite obvious from the record, and I so find, that the plaintiff's trade-mark was always used on its labels and advertising matter associated with the facsimile of the signature "E. W. Grove, Inventor," and the circular accompanying each box of plaintiff's tablets refers to this signature as identifying the "true and original" Grove Laxative Bromo Quinine tablet.

6. On the question of laches, I find that soon after 1902, at any rate before 1911, the plaintiff's predecessors knew that Billings Clapp Company was manufacturing and selling its Laxative Phospho Quinine tablets and was aware of the labels which Billings Clapp Company were using upon its packages. No action was taken to prevent Billings Clapp Company from manufacturing and selling this tablet, and it was permitted, without objection, to build up a trade in its tablets extending throughout the country. It was not until November, 1933, that defendant first learned that plaintiff claimed any infringement of its trademarks, and suit for injunction was commenced June 21, 1934.

6½. Defendant was not able to segregate sums paid for advertising its tablet from the expenditures made in advertising all of its products. It is quite apparent, however, from the record that its advertising consisted principally in catalogues, display cards, and in prominently displaying its product in drug stores. Apparently it never entered upon an intensive campaign of advertising, such as seems to have been carried on by the plaintiff during the last 5 years.

There is no evidence bearing upon plaintiff's expenditures for advertising its tablets prior to 1931. From that date up to April, 1935, the plaintiff appears to have spent approximately one-half million dollars annually for advertising its tablet throughout the United States in papers, magazines, and over the radio.

7. The plaintiff has alleged in its bill of complaint that the tablets of the defendant are greatly inferior to the plaintiff's. This allegation is denied, and expert testimony was offered by both parties upon this issue. It appeared in evidence that the

plaintiff's tablet contained three-fourths of a grain of quinine in the form of quinine hydro-bromide, whereas the defendant's tablet contained only one-tenth grain of quinine. It also appeared that the plaintiff's tablet contained one grain of acetanilide, whereas the defendant's contained one-half grain. If quinine is an efficacious remedy for colds, which defendant's experts deny, then of course the plaintiff's tablet is superior. On the other hand, if acetanilide is a harmful ingredient, the plaintiff's tablet is the more harmful. I gather, from the testimony of the experts, that all agree that neither tablet would be prescribed for a cold, this opinion being obviously based upon prejudice of doctors against self-medication.

So far as the relative merits of the two tablets are in controversy, I am inclined to leave the question to the medical profession, where it more properly belongs.

In view of my conclusions, the comparative worth of the two remedies becomes a matter of no legal significance.

8. The defendant charges the plaintiff with unclean hands because, in the pamphlets accompanying the packages and in its advertising, it has misrepresented the therapeutic efficiency of its tablets. Undoubtedly, the plaintiff has indulged in "puffing" its product and has made representations which somewhat exaggerate the therapeutic value of its remedy. It is said that the tablet "meets the requirement of a complete and reliable cold remedy" because it does four distinct things: "It opens the bowels gently but thoroughly; destroys the infection in the system; relieves the headache, and tones the entire system."

From the evidence it is possible to find, and I do find, that the tablet does not meet the requirements of a complete and reliable cold remedy; that it does not destroy the infection in the system. It is also claimed by the plaintiff that the tablet is entirely harmless. I am inclined to accept the statement of defendant's expert that tablets containing a grain of acetanilide, taken in quantities of eight grains during the day, are not absolutely harmless in the sense that every one could take such a quantity of acetanilide within that time without feeling any injurious effects. For some, the tablet might be harmless; for others, it would not be.

### Conclusions of Law.

This suit charges both infringement of a technical trade-mark, registered in Massachusetts and in Washington, and also charges the defendant with acts amounting to unfair dealing in the manufacture and sale of defendant's "Laxative Phospho Quinine" tablets.

Laying to one side for the moment the question of infringement of a technical trade-mark and considering solely the question of unfair competition, it is my opinion that the facts do not warrant the court in granting relief, and this for two reasons:

First. While the plaintiff was the first in point of time to adopt its alleged trade-mark, nevertheless the record fails to disclose any intention on the part of Billings Clapp Company to encroach upon whatever good will plaintiff's predecessors may have acquired at the time Billings Clapp Company began to manufacture and sell its tablets. The marked dissimilarity between the labels used by the predecessors of the parties hereto would seem to negative the idea of any such attempt.

The defendant is quite within its rights in manufacturing and selling a remedy for colds in tablet form. It may even manufacture them according to plaintiff's formula, provided it sells them as its own product and not as that of the plaintiff. Plaintiff, by registering its trade-mark, acquires no monopoly either in cold tablets or in the combination of ingredients in them. Amoskeag Manufacturing Co. v. Trainer, 101 U. S. 51, 25 L.Ed. 993; Saxlehner v. Wagner, 216 U.S. 375, 30 S.Ct. 298, 54 L.Ed. 525; Warner & Co. v. Lilly & Co., 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161. Cf. American Trading Co. v. Heacock Co., 285 U.S. 247, 52 S.Ct. 387, 76 L.Ed. 740.

Defendant exceeds its lawful bounds only when it attempts to palm off on the public its tablets as those of the plaintiff. The defendant has not done this, nor has any purchaser ever been deceived or led to purchase defendant's for plaintiff's tablets as a result of any act of the defendant. The defendant cannot be held responsible for frauds practiced upon the public by a dishonest druggist who purchased, in bulk, defendant's plain tablets known as "Laxan" and who dressed them up in packages to simulate the defendant's labels, with the deliberate purpose of substituting these Laxan tablets for the plaintiff's.

I am aware that it is not necessary to prove actual deception when the natural and probable result of the use of labels would deceive the ordinary purchaser exercising ordinary care and purchasing un-

der ordinary conditions. Wolf Bros. & Co. v. Hamilton-Brown Shoe Co. (C.C.A.) 206 F. 611; Aluminum Cooking Utensil Co. v. National Aluminum Works (D.C.) 226 F. 815; Notaseme Hosiery Co. v. Straus (C. C.A.) 201 F. 99. The findings of fact, however, do not bring this case within the rule. The labels employed by the defendant in selling its Laxative Phospho Quinine tablets are so far unlike the labels used by the plaintiff that there can be no reasonable probability that a purchaser would be confused. This view, I think, is strengthened somewhat by the fact that plaintiff's label prominently features the facsimile of the signature of L. B. Grove as the inventor.

■ Second. Since the defendant may lawfully use the name descriptive of the ingredients in its tablet, and is only required to refrain from imitating plaintiff's labels, it is clear, from the authorities, that it is now too late for the plaintiff to complain that the labels used are not sufficiently distinguishable. This statement is made on the authority of Beech-Nut Co. v. Lorillard Co., 273 U.S. 629, 47 S.Ct. 481, 482, 71 L. Ed. 810. In that case the defendant, in 1911, adopted the word "Beech-Nut" as a brand for tobacco. In 1921 the plaintiff sought to enjoin further use of this trade-mark. It was held that the plaintiff was not entitled to relief, and Mr. Justice Holmes, in the course of his opinion, said: "It may be true that in putting a hyphen between Beech and Nut, framing its label with an oval and substituting a beechnut for a squirrel in the center the defendant was trying to get an advantage from the plaintiff's good will and if challenged at once might have been required to make it even plainer than it was made by the word 'Lorillard's' in large letters upon the label that the plaintiff had nothing to do with the goods. But the plaintiff waited until 1921. * * * The time and the need for that additional precaution has gone by." See, also, Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 21 S.Ct. 7, 45 L.Ed. 60; Coats v. Merrick Thread Co., 149 U.S. 562, 13 S.Ct. 966, 37 L.Ed. 847.

In the case at bar the plaintiff waited 32 years after the defendant's predecessor had adopted its label before it raised any objections and at least 20 years after plaintiff's predecessor knew of defendant's product and the labels used by it in the sale thereof.

■ Coming to the question whether the defendant has infringed a legal technical trade-mark, it is quite apparent that plaintiff relies upon a trade-mark consisting of the letters "L. B. Q." inclosed within a circle impressed or embossed upon its tablets, and the same symbol employed upon its labels. The trade-marks in evidence, showing the words "Laxative Bromo Quinine," must be disregarded as not revealing proper subject matter for a trade-mark, since the words are descriptive of the compound. Paris Medicine Co. v. W. H. Hill Co. (C. C.A.) 102 F. 148; Warner & Co. v. Lilly & Co., supra.

■ If it should be urged that the words "Laxative Bromo Quinine" have acquired a secondary meaning from the long-continued use by the plaintiff, the complete answer to that is that the defendant does not use these words and, as already indicated, the use by the plaintiff cannot deprive the defendant of its right to use words descriptive of the ingredients in its tablets.

■ It is argued by the defendant that the trade-mark, consisting only of the letters "L. B. Q." surrounded by a circle, must fall with those trade-marks which include the descriptive words "Laxative Bromo Quinine." The cases cited to support the defendant's contention seem to me to go no further than to hold that no one can appropriate letters if they are meant to indicate only the quality of the goods to which the letters are applied. Amoskeag Manufacturing Company v. Trainer, supra. That is not the situation which confronts the court in this case. The letters "L. B. Q." were never used for the purpose of signifying the quality of the tablet. As used in the circle and upon the tablet, they become a symbol identifying the tablets as those manufactured by the plaintiff and its predecessors.

As to infringement, it is quite apparent that the letters "L. B. Q." and "L. P. Q.," when embossed upon tablets of the same size and color, present a similarity, both to the eye and to the ear, which could easily be confusing. It has appeared in the findings that the plaintiff's tablets are in the trade often known as "L. B. Q." tablets. In order to sustain a charge of infringement of a trade-mark, it is not necessary that the infringing mark be in all respects identical with the mark infringed. McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828.

I rule, therefore, that the trade-mark "L. B. Q." with a circle is a valid trademark and is infringed by imposing upon

the defendant's tablets the initials "L. P. Q."

■ Here again the laches of the plaintiff materially affect the equitable relief to which it may be entitled. It is well-settled law that, even though a plaintiff has not abandoned by acquiescence its trade-mark, thereby creating new rights in the defendant, nevertheless long delay will deprive it of its right to recover damages for past infringement. McLean v. Fleming, supra; Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526; Saxlehner v. Eisner & Mendelson Co., supra.

It is said that these cases illustrate the rule that, when proof of infringement is clear, a court of equity will not refuse injunctive relief, even when acquiescence or laches disentitle one to damages.

■ In view of my findings of fact that the good will, including the right to use trade-mark and trade-names appropriated by Billings Clapp Company, passed with an existing business to the defendant, it is not necessary to deal with the plaintiff's argument, based upon the well-established rule that there can be no acquisition of trade-mark rights as property, except as a right appurtenant to an established business or trade in connection with which the trade-mark is employed. United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141.

■ It is necessary to dispose of defendant's contention that the finding to the effect that the plaintiff has overstated the therapeutic merits of its remedy precludes the plaintiff from obtaining equitable relief because of the maxim that he who comes into equity must come with clean hands. I do not think this contention can be sustained, especially in view of what the court has declared to be the law in Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 147, 78 L.Ed. 293. In that case the maxim, its meaning and application, are fully considered. It is there stated that one who asks relief from a court of equity must have acted in good faith. "The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abetter of iniquity."

It is further observed: "But courts of equity do not make the quality of suitors the test. They apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. They do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication. Story, Id., § 100. Pomeroy, Id., § 399. They apply the maxim, not by way of punishment for extraneous transgressions, but upon considerations that make for the advancement of right and justice. They are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion."

In the light of this limitation upon the application of the maxim, it would seem that any extravagant statements made by the plaintiff respecting the merits of its product, even though not strictly true, would not be such a wrong as would entitle the defendant to invoke the maxim.

The plaintiff may have an injunction enjoining and restraining the defendant from hereafter embossing upon its tablets the initials "L. P. Q." In all other respects the prayers of the plaintiff for equitable relief, including an accounting, are denied.

The defendant's request for findings of fact and rulings of law are granted so far as consistent with the foregoing; otherwise they are denied.