## WESTINGHOUSE ELECTRIC CORPORATION v. HANOVIA CHEMICAL & MANUFACTURING CO.

### Civ. No. 4271.

District Court, D. New Jersey.

June 23, 1948.

George D. Richards, of Newark, N. J., Drury W. Cooper, John N. Cooper, and Victor S. Beam, all of New York City, and William F. Kelly, Jr., of Camden, N. J., for plaintiff.

Lum, Fairlie & Foster, all of Newark, N. J., and Ralph E. Lum, Watson, Bristol, Johnson & Leavenworth and Clair v. Johnson, all of New York City, and Karl Huber, of Newark, N. J., for defendant.

MEANEY, District Judge.

The plaintiff, Westinghouse Electric Corporation, brings this action, asking for a declaratory judgment under the provisions of 28 U.S.C.A. § 400. The complaint sets forth that the plaintiff is engaged, among other activities, in the manufacture and sale of ultra-violet high pressure mercury vapor lamps, which have met with a large and increasing measure of success with the trade and the purchasing public; that the defendant has, under instruments in writing, the exclusive right to make, use and sell, including the right to license and sue others, in the field of ultra-violet high pressure mercury vapor lamps, under letters patent of the United States No. 2,202,199, granted to General Electric Co., a New York corporation, on May 28, 1940, for Discharge Device, on application of Edmund Germer. It further alleges that the defendant has notified plaintiff's customers that their use of ultra-violet high pressure mercury vapor lamps, manufactured and sold them by plaintiff, infringe upon the defendant's exclusive rights under the aforementioned patent, the plaintiff contending that the ultra-violet high pressure mercury vapor lamps, which it makes and sells and has made and sold, do not infringe the said patent, and that it is entitled to continue to engage in such manufacture and sale without threat of infringment against it or its customers or the users of its said lamps.

The plaintiff asserts that an actual controversy therefore exists between the defendant and plaintiff.

Asking for relief in the premises, the plaintiff prays this court to declare, adjudge and decree that the plaintiff in the manufacture and sale of its ultra violet high pressure mercury vapor lamps has not infringed upon any of the claims of the letters patent No. 2,202,199, and that it is the right of the plaintiff to continue its processes with said lamps without threats or other interference by the defendant, based on its rights in the aforementioned patent. Further the plaintiff asks the relief of the issuance of an appropriate injunction to effect the purposes of the requested declaratory judgment.

The defendant, answering, denies that the lamps of the type referred to and manufactured and sold by plaintiff do not infringe patent No. 2,202,199 and admitting that an actual controversy exists as set forth by plaintiff, asks that there be a declaratory decree that the plaintiff has infringed upon the exclusive rights of the defendant under said patent.

Extensive hearings were held and testimony of a highly technical, elaborately involved nature was given, both sides producing skilled experts, trained technicians and master theoreticians, along with a plethora of imposing exhibits. All this for the solution of a question of deceptive simplicity—do the Westinghouse ultra-violet high pressure mercury vapor lamps infringe U. S. patent No. 2,202,199?

In consideration of this question, there is danger of falling between the Scylla of over-simplification and the Charybdis of confusion arising out of the welter of contradictory theories advanced in the testimony, and the crowded field of invention indicated by the prior art introduced into this case, and its record. However, the situation may preliminarily be set forth by attempting to reduce the question at issue to the pertinent points as set forth in the allegations of the complaint attempting to establish non infringement, and the limitation thereof to the field comprehended by the proof. Involved in this suit are various kinds of lamps, indicated in the Admissions, as A–H4, B–H4, C–H4, E–H4, A–H5, D–

H1, B–H12, B–H9. These lamps differ only in minor details, and the determination of the court as to the lamp A–H5 referred to throughout the trial will be applicable to all of the lamps above mentioned.

The patent in question No. 2,202,199 (hereinafter referred to as '199) was issued to the General Electric Co. on May 28, 1940 on an application filed March 25, 1938, by one Germer as a continuation of Germer's previously mentioned parent application No. 500,346, filed December 5, 1930. This latter became involved in Interference No. 70,935 with an application of Westinghouse, involving a single count differing in scope from the present issue. After the interference, patent No. 2,262,177 (hereinafter referred to as '177) was issued on the parent application on November 11, 1941.

General Electric Company acquired Germer's patent rights in 1939, subject to Hanovia's exclusive rights in the field of Ultra violet high pressure mercury vapor lamps, secured by an Agreement of January 1, 1936 (Ex.D–28).

With regard to the question of infringement of the Germer patent, prior to the trial Hanovia informed Westinghouse that it would rely on claims 2–10, 12, 13, 15–19, and 21–24, and that it believed that claims 2 and 19 might be taken as typical. Claim 19 is substantially the same as claim 2 except that it is more specific in stating that the starting atmosphere is a rare gas, and that the vaporizable material is mercury. During the trial the evidence related almost entirely to claim 2.

Claim 2 reads as follows: "2. A radiant electrical discharge device which comprises fixed electrodes spaced apart a distance greater than twice the diameter of the confining means hereinafter mentioned at least one of which is a solid activated arcing electrode, and adapted to carry without destruction a current loading sufficient to maintain increased vaporization as hereinafter specified, means for confining the atmosphere of the discharge and for limiting the heat dissipation therefrom, the heat dissipating surface of which is limited so that, at the temperature required to maintain said increased vaporization, the dissipated energy in still air at room temperature does not exceed that attainable by current load-

ing within the capacity of the electrodes to carry without substantial destruction, a filling in the confining means adapted to provide an ionizable atmosphere at relatively low pressure for starting, and including also vaporizable material the vapor of which is adapted to carry the discharge which is in amount sufficient when vaporized to increase the operating voltage drop of the discharge to at least double that of the lowest voltage reached after starting, and an energizing circuit connected to the electrodes adapted to supply the discharge with electrical energy sufficient to maintain said vaporization."

It may be pertinent to remark that the term "solid activated arcing electrode" used in this claim, is commented upon and described by Germer in the patent '199. In lines 8-10, on page 2, col. 1, the statement is made, "By 'solid' electrodes I distinguish from liquid or 'pool' electrodes and without reference to compactness or apparent density". Later at lines 28-57, page 2, col. 2, where the following language is used: "The electrode body proper as indicated at 6 consists of three or four thick turns of electrode material, which may consist of conductors of small section for example, of metal gauze, mesh or twisted wires or ribbons of nickel or other refractory metal. The electrode body is not in the form of a filament but in the form of a more compact unit and with a porous absorbent structure into which an activating material may be filled. This filling and/or coating of activating material is an important feature of the electrode used in this embodiment of my invention. The activating mass which is sucked or filled into the porous cathode electrode body proper is deposited onto said body by repeatedly dipping, brushing or pressing it in a suitable solution or paste and with the application of heat. Such paste may consist firstly of highly emissive substances such as barium oxide, and/or other electro-positive compounds, and secondly, of materials which are difficult to dissociate and thus preserve their insulating character during the life of the tube, are immune or highly resistant to ionic disintegration; zirconium oxide is such a material. The emissive substance is further activated, advantageously by application of high frequency heating, until the barium oxide is mostly reduced and the remaining mass is saturated with free barium and/or complex compounds formed of barium." These quotations have been set forth at length, since the court deems them significant in the solution of one of the most determinative questions at issue.

In an attempt to reduce the question at issue to its narrowest compass, the defendant in its brief asserts that during the trial the whole matter was "boiled down" to the question of whether or not Westinghouse uses an activated electrode in its lamps. The court is of the opinion that this is a very important factor to be considered in determination of the case. The plaintiff insists that this plays only a "small part" in the question of infringement. However, despite their respective attitudes both the plaintiff and the defendant find this and other matters worthy of extensive discussion in their briefs.

The Westinghouse Lamp A–H5 consists of a quartz tube with two main electrodes, one at each end, supported by a lead-in wire, that passes out through the end of the tube, and through which the operating current passes. A starting electrode is sealed close to the main electrode at the base end. Each of the main electrodes consists of a coil of tungsten wire surrounding 5 milligrams of thorium, and a tungsten lead-in wire. The tungsten coil and lead-in wire are pure tungsten so far as can be manufactured, but cannot be of absolute purity, none of its minute impurities being thorium. The thorium insert in the tungsten coil is 99.4 or 99.5% pure, the impurity therein consisting of thorium oxide so far as is ascertainable.

The starting electrode sealed in the same glass bead with one of the main electrodes is made of the same kind of tungsten wire as the lead-in wire, and has no thorium associated with it. This starting electrode is connected with the electrode at the opposite end of the quartz tube through an appropriate resistance of several thousand ohms.

The thorium insert is held in position in the tungsten coil by squeezing the coil by means of a hot or cold clamper and in some

cases by the insertion of additional tungsten wire in lieu of clamping.

After the electrodes have been assembled they are sealed in the quartz tube in an atmosphere of inert gas. The quartz tube having been sealed on to a vacuum system is baked at a temperature of 500° to 800° centigrade. Thereafter the tube is filled with argon at the pressure used in the operating lamp (20 m m) and a current is passed through that, without use of the starting electrode, transformers of 350 volts being used, and a temperature of 2500° Kelvin being attained, at the arcing points on the electrodes. This serves for the process of degassing. Then a vacuum of not less than 1 micron or 10-3 m m pressure is attained. After the degassing and evacuation procedure, there is introduced into the tube 60 milligrams of mercury, and argon at a pressure of 20 m m. The quartz tube is then mounted in an evacuated outer tube, with a base for screwing into a socket.

When the voltage is applied to the lamp, a series of actions and reactions is put in operation; and as to those, their causes, the condition existent at any particular stage, and the progress of processes until the lamp is in full operation, theories commonly accepted in the domains of chemistry (to a limited extent) and physics,—more particularly electronics and thermionics are adduced to explain the mystery of what takes place within the confines of the inner quartz envelope. From the testimony, it would appear that when the voltage is applied, the current first passes across the narrow space between the starting and the nearby main electrodes, causing a glow. As this main electrode is resultantly heated, it emits electrons and an arc is established between the two main electrodes, first through the argon gas and then through the mercury vapor which is produced as the mercury present in the inner quartz envelope is affected by heat. The inner pressure is increased with the increasing vaporization of the mercury, and the arc constricts, with the voltage rising, until the full operating pressure of approximately four atmospheres is attained. Such observation as it was possible to make at the initiation of operation of the lamp, and the showing of motion pictures produced by the witnes Nottingham, indicated that the arc, in lamps which made use of electrodes made up of tungsten and thorium, initiates and is first established on the thorium and then when the tungsten is heated, the arc is transferred to and is assumed by the tip of the tungsten coil and is thereafter maintained there.

The matter of voltage drop and rise as affected by the use of thorium in conjunction with tungsten is important in that ionic bombardment of the cathode may be relatively harmless to that cathode or productive of rapid disintegration, dependant on the nature of the bombardment as affected by the voltage drop. If the ions strike the cathode with an amount of energy corresponding to a difference in potential of less than 20 volts, little damage is done to the cathode. But if the ions assault the cathode with a voltage drop of more than 20 volts, surface atoms are sputtered off and disintegration of the cathode ensues. It would seem that there is a distinct difference between tungsten electrodes which start at approximately 27 volts which would result in terrific ionic bombardment, and thorium tungsten electrodes which start at 20 volts or less. The defendant concludes that the favorable result is because of the use of an activated electrode of thoriated tungsten or a tungsten electrode which, in the Westinghouse lamp, it asserts, had a monolayer of thorium. However, the plaintiff observes succinctly that the notion of operation of the lamp based on the existence of a monolayer of thorium on the tungsten is a complete misconception of what actually takes place. The theory of the plaintiff indicates that activity in arc initiation begins not in any monolayer of thorium on tungsten, but on the thorium itself, the arc later transferring to and being maintained by the tungsten in its original state.

Insofar as the court apprehends the theory advanced by the defendant, in relation to the Westinghouse electrodes, the contention is that by apposition of the thorium to the tungsten, in view of the high temperatures produced in the assembly of the electrode, particularly in the arcing process, subsequent to the degassing hereinbefore referred to, a process of mi-

gration of thorium on the tungsten is produced which results in the formation of a monolayer of thorium on the tungsten; and consequently the creation of what is called in the defendant's theory, an activated electrode. It is also suggested that during the process of "hot clamping", when pressure is applied with heat to the tungsten enveloping the thorium, that some of the thorium is actually in a liquid state and that migration occurs then. That the thorium is in a liquid state during hot clamping is suggested in view of the concave miniscus on the thorium where it came in contact with the tungsten coil, as shown on the photomicrographs of a sectioned Westinghouse electrode. All of this line of thought is supportive of the theory that an activated electrode is the important factor in the operation of both the Westinghouse and the Hanovia lamps, and that activated electrodes as utilized in these lamps are included within the claims of the Germer patent.

The defendant enlarges on the importance of the idea of an activated electrode, produced, as it alleges, by migration in the Westinghouse electrode, because of the appreciable reduction in the work function with consequent increase in electronic emission of the electrode at any given temperature. It contends that Westinghouse, through its employee Dr. McNall, recognizes that the work function of the tungsten is 4.52 electron volts, thorium 3.3 to 3.6 and thorium on tungsten 2.63. The inference drawn is that the Westinghouse lamp functions as it does because of the lower work function of the migration created activated electrode.

In its total rejection of such explanation, the plaintiff flatly denies that its electrodes are activated, and practically hoots at the thought that the thorium contained in the coil of the electrode migrates to form a monolayer on the tungsten. It controverts the migration theory by the assertion that even granting the minimal peripatetic activity of the thorium, the monolayer of thorium on tungsten could not exist because it would be poisoned by the residual oxygen and water vapor present in the quartz envelope at the degree of evacuation existent therein, and in addition that if the tempera-

ture at the tip of the electrode (reaching 2500° K) had not already destroyed the monolayer, the positive ion bombardment on the tip would definitely do so.

To Professor Nottingham's demonstration that a migrated monolayer could and does exist, plaintiff replies that the conditions existent in the demonstration tube were not the same as those present at any time in the Westinghouse tube and particularly that the degree of evacuation reached in the Nottingham experiment was of the order of 100 millionths of a millimeter of mercury pressure while the highest vacuum reached in the A–H5 lamp is of the order of one micron. The conclusion drawn from this state of facts is that the residual water vapor and oxygen present in the A–H5 tube is sufficient to poison the monolayer if it exists, whereas in the much higher vacuum of the Nottingham experiment such an effect would probably not be brought about.

The plaintiff reiterates that the physical conjunction of thorium and tungsten as found in the Westinghouse electrode produces a highly desirable result and in conjunction with other features of its lamp produces a lamp, stable of operation regardless of ambient temperature. Just how far the element of the radio-activity of thorium plays a part in the starting process, by virtue of the thousands of alpha and beta particles and gamma rays which come out of the thorium each second, is provocative of speculation in which the court feels it is not necessary to indulge. But out of intense concentrated consideration of what the court with its necessarily limited experience in the complicated field of advanced physics (to which the expert witnesses called have devoted most of their intellectual lives) deems to be the crux of the situation, there has developed in the court's mind the conclusion that between the idea of an activated electrode as envisaged by Germer and claimed in his patent, and the actual electrode made use of by the plaintiff in its lamp, there is a difference such as would prevent the court from finding that in this respect there was a trespass upon the Germer patent.

As for the other elements involved in the manufacture of the lamps in question, the court feels that briefer disposition may

be made of the remaining questions. In view of the limitations which the prior art imposed on the Germer patent, the court is of the opinion that there has been no infringement. Not the use of a quartz envelope, nor the use of a rare gas at special pressure constitute invasion of the rights of the defendant. The gas used in the Westinghouse lamp is at a pressure critically different from Germer's teaching. Insofar as the use of Mercury is concerned, Westinghouse uses a very small amount of mercury, which is completely vaporized. Germer would seem not to have taught the use of a limited amount of mercury, sufficient for complete vaporization. The interference proceeding mentioned in the early part of this opinion has been referred to as indicative of Germer's teaching of the use of a limited amount of mercury, but examination and analysis of the interference proceeding does not seem to support this idea. And it is of interest to note that the drawings in patent '199 show a depression in the tube to contain the mercury, which would seem to indicate Germer's lack of appreciation of the concept of a limited ·vaporizable amount of mercury. The proportioning of the dimensions of the tube to the electrode in the Germer patent is not present in Westinghouse construction. In this connection it is well to notice that Germer suggests the use of heat insulating material for heat caps to be used so that the Germer lamp might operate at a given temperature and loading. Change in ambient conditions meant a change in power to the Germer lamp or a change in heat insulation. The Westinghouse lamp operates stably and in any position under varying ambient conditions which result is obtained, as alleged, by proportioning the amount of mercury to the known volume of the lamp.

The fact that the Westinghouse lamp as such is to be used in connection, or for connection with energizing circuits does not seem to the court to constitute infringement of the claims of the Germer patent. It has been decided time and again that a patent does not confer the right on the owner of the patent to be free from competition in the supply of unpatented material to be used in practicing its invention.

The court is aware of the long line of definitive decisions which indicated that infringement signifies merely correspondence between the patent and the accused device as to the substantial, dominant and essential elements. It is also cognizant of the many holdings of the Supreme Court which have attempted to establish the exact criteria for invention and infringement. In the final analysis the application of those standards and definitions to specific cases is dependent on the acumen, the appreciations and the convicted responses of him whose task it is to find conformity or nonconformity between the standards and the facts at bar.

It is therefore declared, adjudged and decreed that the plaintiff herein has the right to continue to manufacture, use and sell its ultraviolet high pressure mercury vapor lamps without interference by or on behalf of the defendants, and that there issue an injunction, enjoining and restraining the defendants, its attorneys, agents, successors and assigns, from asserting or representing that patent No. 2,202,199 or any claim thereof, has been infringed by the plaintiff in the manufacture, use and sale of the lamps referred to in this suit.

Let an order be entered in conformity with the findings herein expressed.