## WESTINGHOUSE ELECTRIC CORPORATION v. HANOVIA CHEMICAL & MFG. CO.
## No. 9825.

United States Court of Appeals
Third Circuit.

Argued Nov. 7, 1949.

Decided Dec. 27, 1949.

Rehearing Denied Jan. 31, 1950.

Earl G. Harrison, Philadelphia, Pa. (Lum, Fairlee & Foster, Ralph E. Lum, Newark, N. J., Clair V. Johnson, New York City, Karl Huber, Newark, N. J., on the brief), for appellant.

Drury W. Cooper, New York City (George D. Richards, Newark, N. J., Victor S. Beam, New York City, William F. Kelly, Jr., Jersey City, N. J., John N. Cooper, New York City, on the brief), for appellee.

Before MARIS, GOODRICH and O'CONNELL, Circuit Judges.

MARIS, Circuit Judge.

The plaintiff, Westinghouse Electric Corporation, brought an action in the District Court for the District of New Jersey seeking a declaratory judgment that in the manufacture and sale of its ultra violet high pressure mercury vapor lamps

294

it had not infringed the Germer Patent No. 2,202,199 owned by General Electric Company under which the defendant, Hanovia Chemical and Manufacturing Company, has exclusive rights in the field of ultra violet high pressure mercury vapor lamps. The district court held that the claims of the patent must be limited to the specific disclosures of the specification and that the plaintiff's lamps do not infringe any of the claims of the patent as thus limited. 78 F.Supp. 403. The court accordingly entered a judgment declaring that the plaintiff has the right to manufacture, use and sell its lamps without interference by the defendant and enjoining the defendant from interfering therewith. The defendant thereupon took the appeal now before us.

The defendant contends that the plaintiff's lamps infringe claims 2 to 10, 12, 13, 15 to 19, and 21 to 24 of the patent in suit. Claims 2 and 19 are said to be typical. The latter claim reads as follows:

"19. An electric lamp which comprises fixed electrodes spaced apart a distance greater than twice the diameter of the confining container, which is hereinafter specified, and at least one of which is a solid activated arcing electrode adapted to carry without destruction a current loading sufficient to maintain increased vaporization as hereinafter specified, a tubular container for confining the atmosphere of the discharge, means for reducing heat dissipation from said container, the heat dissipation of said container being limited to such extent that, at the temperature required to maintain said increased pressure, the dissipated energy in still air at room temperature does not exceed that energy attainable by current loading which the electrodes are adapted to carry without substantial destruction, a rare gas at relatively low pressure in said container whereby starting is facilitated, a quantity of mercury in said container in amount sufficient when vaporized to increase the operating voltage drop of the discharge to at least double that of the lowest voltage reached after starting, and an energizing circuit connected to said electrodes, said circuit including means for supplying the discharge with electrical energy sufficient to maintain said vaporization."

It will be seen that the invention claimed involves a combination of a number of elements in a high pressure mercury vapor lamp. It is the combination of all these elements which produces the new result described by the specification of the patent. The element which the defendant particularly stresses is the solid activated arcing electrode. The district court found that the plaintiff does not use in its lamps solid activated arcing electrodes of the kind referred to in the claim just quoted. The defendant's heaviest attack is upon this finding for unless it is set aside as erroneous it establishes that the plaintiff does not follow the teachings of the patent and the determination of non-infringement by the district court must accordingly be affirmed. Since the electrodes employed by the plaintiff are shown by the evidence to be of the solid arcing type the question comes down to whether they are activated within the meaning of the claims of the patent in suit. We accordingly proceed to consider that question.

In the operation of a high pressure mercury vapor lamp the electrode which is functioning as a cathode emits a stream of electrons which passes through the arc to the electrode which is functioning as an anode. It is, therefore, important to use a cathode which will emit electrons readily or which, as it is said, has a low work function. At the same time the cathode must withstand the high temperatures and ionic bombardment which it experiences during the operation of the lamp and particularly each time it starts. The more electro-positive metals, such as sodium, barium and thorium, cannot be used alone as cathodes since they melt at operating temperatures. The more refractory metals, such as tungsten and nickel, on the other hand, have such a high work function that if they are used alone the greater voltage drop at the cathode results in such an intense bombardment of the cathode by ions from the vaporized mercury in the tube as to cause the metal of the cathode to sputter,

with a resultant blackening of the tube and gradual disintegration of the cathode.

It was discovered long before the date of Germer's application that the association of an electro-positive metal with a more refractory metal resulted in producing an electrode having a lower work function, that is a higher electronic emission, than either of the two metals alone. In this connection barium oxide was widely employed, the oxide breaking down under operating temperatures and releasing free barium. The use of thorium was also known. The theory is that under appropriate conditions an electro-positive metal, such as barium or thorium, migrates over the surface of the more refractory metal such as tungsten with which it is in contact and forms a monolayer thereon which enables the electrode when functioning as a cathode to emit electrons more copiously and at lower temperatures than would otherwise be possible. Such an electrode is said to be activated.

The district court found as a fact that the electrodes employed by the plaintiff in its lamps were non-activated electrodes of thorium and tungsten. The defendant strongly urges that this finding is so clearly erroneous that it must be set aside.

The electrode used by the plaintiff consists of a coil of tungsten wire surrounding a small piece of metallic thorium. The tungsten is as pure as can be manufactured, none of its minute impurities being thorium. In the course of the manufacture of the lamp it is arced for the purpose of degassing, during which operation a temperature is attained at the arcing points on the electrodes of 2500 degrees Kelvin, which is much above the melting point of thorium. It may be, as the defendant contends, that during this process as well as during the later operation of the lamp, migration of the thorium upon the surface of the tungsten wire constituting the electrode takes place so that the plaintiff's electrode becomes an activated one in this sense. We need not decide whether the district court was wrong in finding to the contrary, however, since we are satisfied that the court was right in holding that the claims of the patent in suit with respect to activated electrodes must be limited to the special kind of activated electrode disclosed by the specification of the patent.

The patent in suit, No. 2,202,199, was issued on May 28, 1940, on application No. 198,049 filed March 25, 1938 as a continuation of Germer's original application No. 500,346 filed December 5, 1930. The original Germer application ultimately resulted in the issuance on November 11, 1941 of patent No. 2,262,177. In the specification set out in Germer's original application No. 500,346 he made certain important statements with respect to the prior art, the place of his invention therein and the nature of that invention. These statements were carried into the specification of patent No. 2,262,177 which ultimately issued on the original application and are as follows:

"On the other hand, lamps have become known with solid electrodes, preferably consisting of a spiral *oxide-coated* and heated wire, and filled with an inert or noble gas preferably with the addition of a metal vapour such as mercury. The disadvantages with this kind of lighting or radiating tube were that one had to provide special heating means for operating the incandescent cathodes. Otherwise, such a lamp *even if oxide-coated, or activated,* will not start burning. * * *

\* \* \* \* \* \*

"The present invention eliminates all these complications or disadvantages and concerns a tube, which requires only one lead wire on each end, and will start burning at the application of only a low voltage, even at the application of the usual distribution voltage.

"This progress has been achieved by using *a special kind of electrode,* by filling with rare gasses at special pressures depending on the dimensions of the tube, and by the provision of a certain amount of metals at definite places inside the tube.

"By applying these and other means which will be described in detail in the following, a process of igniting and burning of the lamp is brought about which may be described as a self heating glow point cathode.

"Directly upon application of low voltage, a glow discharge occurs, and this discharge has a special characteristic: *it does not start from the cathode surface evenly and uniformly as in the case of* bare metal cathodes or *metal cathodes covered with a film of activated alkaline metals.* On the contrary, it starts from quickly moving little glowing points, due to the provision of heat concentrating means as constituents of the electrodes. These glow points are transferred rapidly into one or more arcing points, and the glow discharge is then transformed into an arc of several amperes, or more. * * *" [Emphasis supplied.]

It will be seen from the foregoing statement that Germer recognized that oxide coated or otherwise activated electrodes were known and used in the mercury vapor lamps of the prior art. Moreover he makes it clear that the "special kind of electrode"[1] disclosed by his patent operates quite differently in the starting of the lamp not only from the way in which a bare non-activated metal cathode would operate but also from the way in which a metal cathode covered with a film of activated alkaline metal would operate. Here he is describing the activated electrode of the prior art, consisting as we have already pointed out of a refractory metal coated with a film or monolayer of an alkaline metal such as barium or thorium, and he is clearly indicating that such an electrode will not operate in his inventive combination to achieve the result which he claims for his invention.

While it may be, as the defendant argues, that the claims of the patent are not necessarily restricted to an electrode conforming in all respects with the description set out in Germer's specification, the fact remains that Germer made it clear that the activated electrode which formed a principal element of the combination of his invention should not only be activated by the application of a highly emissive substance such as barium oxide or other electro-positive material but should in addition have applied to it a material, such as zirconium oxide, which would be difficult to dissociate and thus would preserve its insulating character during the life of the lamp, as well as be immune or highly resistant to ionic disintegration. For it is "due to the provision of heat concentrating means" of this sort as a constituent of the electrode, as Germer pointed out in his original application, that his cathode is enabled to start "from quickly moving little glowing points" rather than from the cathode surface evenly and uniformly as in the case of the activated electrodes of the prior art which were not treated with heat insulating material of this kind. And it is this very feature which he asserts enables him to achieve one of the objects of his invention, the ability of the lamp to start at normal supply line voltage.

▮ The claims of a patent must always be explained by and read in connec-

---

1. In the specification of Patent No. 2,202,199, Germer describes the electrode of his invention as follows:

"The electrode body proper * * * consists of three or four thick turns of electrode material, which may consist of conductors of small section for example, of metal gauze, mesh or twisted wires or ribbons of nickel or other refractory metal. The electrode body is not in the form of a filament but in the form of a more compact unit and with a porous absorbent structure into which an activating material may be filled. This filling and/or coating of activating material is an important feature of the electrode used in this embodiment of my invention.

"The activating mass which is sucked or filled into the porous cathode electrode body proper is deposited onto said body by repeatedly dipping, brushing or pressing it in a suitable solution or paste and with the application of heat. Such paste may consist firstly of highly emissive substances such as barium oxide, and/or other electro-positive compounds, and secondly, of materials which are difficult to dissociate and thus preserve their insulating character during the life of the tube, are immune or highly resistant to ionic disintegration; zirconium oxide is such a material. The emissive substance is further activated, advantageously by application of high frequency heating, until the barium oxide is mostly reduced and the remaining mass is saturated with free barium and/or complex compounds formed of barium. * * *"

tion with the specification[2] and in the light of definitions and admissions made by the applicant in the proceedings in the Patent Office.[3] Here, as we have seen, Germer in his original application indicated to the Patent Office not only that activated electrodes were known in the prior art but also that the ordinary activated electrode was not operative in his inventive combination. He made it clear that only his specially activated electrode would do for that purpose. It may be, as the defendant contends, that the prior art did not disclose the use of ordinary activated electrodes in mercury vapor lamps operating under high pressure. If so, Germer could, and doubtless would, have claimed them if he had discovered the conditions under which they were operative. It is evident, however, from his statements to which we have referred that he did not discover this but on the contrary rejected them as inoperative. By thus allotting the use of ordinary activated electrodes to the prior art Germer effectively disclaimed them as part of his combination regardless of whether they had in fact been used previously in such a combination. We conclude, therefore, that the district court had ample basis for holding that the claims of the patent in suit must be limited to specially activated electrodes of the type which the patent taught were operable.

■ When the claims of the patent in suit are thus construed as limited to the use of a specially activated electrode having not only an electro-positive metal but also a heat insulating highly resistant material applied thereto it becomes evident that the district court rightly held that the plaintiff's lamps do not infringe. For regardless of whether or not they employ activated electrodes in the sense that the tungsten of their electrodes becomes covered with a film of thorium there is no suggestion in the evidence that the novel feature of the Germer electrode, a coating of a heat insulating highly resistant material such as zirconium oxide, is present.

■ The district court found as facts that "Germer taught the use of a special form of electrode of special physical structure with a mass of complex compounds placed thereon, some of which as a result of a chemical reaction were reduced and other compounds of said mass being difficult of dissociation or chemical change in order to obtain the desired result" and that "Plaintiff does not employ Germer's specially activated solid electrode." For the reasons already stated we think that these findings are amply supported by the evidence. They in turn furnish sufficient support for the conclusion of the district court that the plaintiff does not infringe any of the claims of the patent in suit and that it is entitled to an injunction to restrain the defendant from asserting such infringement. Accordingly it becomes unnecessary for us to consider the defendant's contentions that the district court erred in finding that the plaintiff's lamps do not include certain other elements of the combination of the patent in suit.

The judgment of the district court will accordingly be affirmed.

Judge O'CONNELL participated in the hearing and consideration of this case but died before it was decided.

2. Carnegie Steel Co. v. Cambria Iron Co., 1902, 185 U.S. 403, 432, 22 S.Ct. 698, 46 L.Ed. 968; Samuel M. Langston Co. v. Continental Container Corp., 2 Cir., 1936, 80 F.2d 847.

3. New York Asbestos Mfg. Co. v. Ambler Asbestos Air-Cell Covering Co., C.C.Pa. 1900, 103 F. 316, 320, affirmed 3 Cir., 1901, 112 F. 1022.