518 F.Supp. 607 (1981)
The BLACK & DECKER MANUFACTURING COMPANY, Plaintiff,
v.
EVER-READY APPLIANCE MANUFACTURING COMPANY, Defendant.
No. 80-43C(2).
United States District Court, E. D. Missouri, E. D.
July 14, 1981.
*608 Charles Haverstock, St. Louis, Mo., Don K. Harness, Birmingham, Mich., for plaintiff.
McPherson D. Moore, St. Louis, Mo., for defendant.

MEMORANDUM
NANGLE, District Judge.
This case is now before the Court for decision upon the merits. Plaintiff brought this suit alleging patent infringement and unfair competition. Defendant, in its answer, sought a declaration that the patent-in-suit is invalid or, if valid, not infringed. Prior to trial, the parties stipulated as to the proper relief. The parties agreed that should plaintiff prevail on any or all of its claims, it would be entitled to injunctive relief and damages in the amount of ten thousand dollars ($10,000.00).
This case was tried before the Court sitting without a jury. This Court having considered the pleadings, the testimony of the witnesses, the documents and depositions in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52, Federal Rules of Civil Procedure.

FINDINGS OF FACT
Plaintiff is a Maryland corporation, with its principal place of business in that state. Defendant is a Missouri corporation, with its principal place of business in that state.
Plaintiff is the present owner by assignment of Patent No. 3,999,629 ('629), entitled "foldable step stool." Plaintiff presently markets this step stool under the tradename "Stowaway" step stool. The '629 patent was originally issued to Elliott Siff and Irving Shaffer, the inventors of the device in question, on December 28, 1976. The patent was initially assigned to Marlene Designs, Inc., a Bridgeport, Connecticut firm which produced and sold the step stool. Marlene Designs, Inc. sold all rights in the step stool, including the patent rights, to plaintiff in October 1978.
The step stool in question is composed primarily of two sets of inner and outer *609 frame members, five cross braces, and two steps. The inner frame members are parallel to each other and connected to each other via three cross braces, and the parallel outer frame members are likewise connected to each other via two cross braces. The inner frame members are pivotally connected to the respective outer frame members to form an X-frame. One step is situated above the pivot of the X-frame and the other is situated below the pivot. The rearward portion of the top step is pivotally connected to the upper cross brace of the outer frame members, and the rearward portion of the bottom step is pivotally connected to the middle cross brace of the inner frame members. The forward portion of the top step is connected to the upper cross brace of the inner frame members by a pin-and-slot connection, the cross brace acting as the pin and a slot being attached to the underside of the top step. The forward portion of the bottom step is similarly connected to the lower cross brace of the outer frame members.
When in an open position, the outer and inner frame members form an "X", and the steps are in a horizontal position. The "X" is skewed such that the steps exhibit a rise and run appropriate to a step stool. The pivot connecting the inner and outer frame members and the outer frame member cross braces are positioned off-center with respect to the outer frame members. When the stool is in a closed position, the inner frame members and the steps are disposed entirely within the planar volume of the outer frame members, which are one inch wide.
With respect to these structural features, defendant's Ready-Steps step stool is nearly identical. Significantly, however, the inner frame members and the lower cross brace on the outer frame members are wider than on the Stowaway model, and, as a result, when in a closed position the inner frame members and the steps are not disposed entirely within the planar volume of the outer frame members. When the Ready-Steps stool is in a closed position, the top step protrudes from the planar volume of the outer frame members one-half of an inch, the bottom step five-eighths of an inch, and the inner frame members one-half of an inch.
Messrs. Siff and Shaffer first applied for a patent for their invention on October 6, 1975. Their application listed nine claims, the first being independent and all the others being dependent on the first. The patent office examiner initially rejected all claims except number nine. The examiner believed that the claims were obvious in view of prior patents, principally Schwartz Patent No. 1,295,073, Barile Patent No. 2,802,578, and Friedenreich Patent No. 2,947,588. The examiner also cited Simmons Patent No. 606,845 and Kade Patent No. 1,217,772.
The Schwartz Patent reveals a folding stool in which inner and outer frame members are pivotally connected to form an X-frame, similar to the patent-in-suit. The seat is pivotally connected to the top of the inner frame members, but is not connected to the outer frame members. When in an open position, the seat rests horizontally on the connecting pivot of the inner frame members and on a tie-bar connecting the tops of the outer frame members. When in a folded position, the inner frame members are disposed entirely within the planar volume of the outer frame members, but the flat surface of the seat protrudes therefrom.
The Barile Patent reveals a collapsible serving stand. The significant revelation of this patent is a lower shelf which is connected to inner and outer frame members below the pivot of the X-frame via a pin-and-slot connection. When in a folded position, however, the lower shelf is not disposed entirely within the planar volume of the outer frame members.
The Friedenreich Patent reveals a reversible top collapsible table. The aspect relevant to the patent-in-suit is that the top is connected to the frame members via a pin-and-slot connection. The Simmons and Kade Patents are relevant only to the extent that they show a slot which is bowed inward slightly to provide a frictional restraint for the pin.
*610 The patent officer examiner initially ruled that to provide Schwartz with a second platform below the pivot of the X-frame would be obvious in view of Barile, and that to connect the upper platform of Schwartz to the frame members with a pin-and-slot connection would be obvious in view of Friedenreich.
In response to the examiner's initial rejection, the application was submitted for reconsideration without amendment. In resubmitting the application, the applicants distinguished the prior art relied on by the examiner. The applicants argued that there was absolutely no way in which Schwartz and Barile could be combined to achieve a structure which met the claim definition with respect to folding flat, i. e. into the planar volume defined by the legs in a folded condition. The applicants argued that:
Barile may be said to suggest adding a second step (actually he does not because he does not really even have a "first" step) but he certainly does not teach what he himself has not accomplished, i. e., he obviously does not suggest a structure capable of folding into a planar volume as described and claimed by Applicants.
Though there is some language in the applicants' arguments supporting reconsideration to the contrary,[1] the basic thrust of their argument is that the prior art fails to disclose any device which meets or makes obvious the claims of the patent with respect to folding entirely within the planar volume of the outer frame members.
The patent office examiner accepted the applicants' arguments for reconsideration, and the patent was issued on December 28, 1976.
In the proceedings before the patent office, the most relevant prior art was not considered. Henry Patent No. 362,379 is for a folding stool. The Henry stool is quite similar to the Schwartz stool, but it is different in two very significant respects. First, the platform is connected to the frame members in basically the same manner as are the steps in the patent-in-suita pivot connection to the outer frame members and a pin-and-slot connection to the inner frame members. Second, when in a folded position, the inner frame members and the platform are disposed entirely within the planar volume of the outer frame members.
The other prior art now cited by defendant is not more relevant than that cited in the patent office.
X-frames and pin-and-slot connections were well-known in the prior art. Henry, Barile, Friedenreich, Kade and Simmons all revealed pin-and-slot connections to X-frames, some with the connections above the pivot of the "X" and some with the connection below. Likewise, the prior art revealed a device, Henry, in which a platform and inner frame members were disposed entirely within the planar volume of the outer frame members. What was not shown by the prior art was a device with two platforms connected to an X-frame in a step stool configuration which would fold entirely flat.
The level of skill in the relevant art is high. Messrs. Siff and Shaffer are both graduate mechanical engineers with approximately twenty-four years of engineering experience. Anthony Ribaudo, who designed the Ready-Steps step stool, has a B.S. in Mechanical Engineering and has over twenty years experience in designing stools, ironing boards and chairs. Furthermore, the overall mechanical engineering field is knowledgeable and skilled in the construction of devices combining simple and common elements, as does the patent-in-suit.
The patent-in-suit has met with a considerable degree of success. Sales of plaintiff's Stowaway stool have been encouraging. The step stool market had long sought a stool which would fold as compactly as *611 does the patent-in-suit. Compactness is a desired quality in a step stool, since a stool's use is determined in large part by its accessibility and convenience. The smaller the dimensions of the folded stool, the easier it is for the consumer to store it in a convenient place.
After the Marlene Designs stool was placed on the market, imitators quickly followed. Action Products, another step stool manufacturer, copied the Marlene Designs stool and came out with its own version, the Stor 'n Step. Defendant, in turn, modified the Stor 'n Step to come out with its version. Plaintiff saw the value of the Marlene Designs stool, bought the rights to it, modified it slightly, and then marketed it as the Stowaway step stool.
Plaintiff acquired the rights to the Marlene Designs stool in late 1978 for marketing by its newly-formed housewares division. Plaintiff had previously been engaged primarily in the production and marketing of tools, and the Stowaway step stool was only the second household item to be marketed by it.
Upon acquisition, plaintiff made several changes in the Marlene Designs stool before marketing it under the Black & Decker name. For safety reasons, plaintiff put a black skid-resistant tread on the steps. Plaintiff also improved the feet on the bottoms of the legs, making them more skid-resistant. Plaintiff installed a latch on the right side of the top step to keep the stool in an open position when it was picked up; the Marlene Designs model would close each time it was moved. Plaintiff attached a black plastic handle to the rear of the top step for convenience in carrying and hanging. Finally, plaintiff decided to market the stool only in the color almond, the color most popular for kitchen accessories at the time; Marlene Designs had sold their stool in five colors. By using only one color, inventory costs were reduced.
Plaintiff's first promotion of the Stowaway stool was in June 1979. A large advertisement heralded its benefits in a catalogue which preceded its unveiling at the August Hardware Show in Chicago. After the Hardware Show, the stool was test marketed in several cities, and stools were shipped to those markets in the beginning of November 1979. The results in the test markets were very encouraging, and plaintiff began soliciting orders nationwide in December 1979.
Plaintiff's marketing plans included extensive advertising nationwide, in order to gain consumer acceptance of this relatively new product. Plaintiff spent approximately $1.3 million on advertising in 1980, and plans to spend approximately $1 million per year after that. This advertising-heavy marketing approach had proven successful with other new products introduced by plaintiff.
Defendant first became interested in its stool in April 1979. Around that time, defendant's marketing representative in the Chicago market had sent defendant an Action Products Stor 'n Step stool, and had suggested that defendant might be able to improve it and market the improved version itself.
The Stor 'n Step stool had been copied from the Marlene Designs stool. Though the geometry and structure were the same, Action Products sold its stool in a two-tone color and used round legs, as opposed to the square and rectangular legs used by Marlene Designs. The outer frame members on the Stor 'n Step stool were also connected by a "U" bend in the frame which served as a handle.
Anthony Ribaudo, Vice-President and General Manager of defendant, was primarily responsible for the transformation of the Stor 'n Step stool into the Ready-Steps stool. He recognized that the "U" bend in the frame of the Stor 'n Step stool was a trip hazard, since it ran slightly above the rear of the top step. He therefore decided to eliminate it. Without the "U" bend, it was then preferable to use square and rectangular tubing, since such tubing was easier to punch offset holes in and to weld on. Round tubing is easier to bend, but with the elimination of the "U" bend, there was no need to bend the tubing.
*612 Other changes made by Ribaudo were quite similar to these made by plaintiff in the Marlene Designs stool. A latch and a handle were added to the top step, and black feet were placed on the ends of the legs. A non-skid tread was placed on the surface of the steps, replacing the non-skid paint used by Action Products. Ribaudo also decided to market the stool only in the color almond, essentially for the same reasons plaintiff decided to do likewise.
Though defendant has admitted that its Ready-Step stool is modeled after the Action Products' stool, there is no evidence that defendant deliberately copied, or even had knowledge of, either the Marlene Designs stool or the Stowaway stool. Ribaudo and Sam Strano, who worked with Ribaudo, both strenuously denied knowledge of those stools, and nothing has been offered to cause this Court to question their credibility. Ribaudo first saw a Marlene Designs stool in November or December 1979, when he was sent one by his sales representative in Chicago.
Defendant made approximately six prototypes of its stool over the course of six to eight weeksfrom early June to late July. Each prototype would change some aspect of the preceding version. By the time of the August Hardware Show in Chicago, defendant's stool was substantially completed, and it was exhibited at that show. It was at this time that plaintiff and defendant became aware of their competing products. Defendant obtained the patent number from plaintiff's stool and subsequently had his attorney research its validity. Personnel from an advertising firm representing plaintiff saw defendant's stool and informed plaintiff of it.
Defendant began soliciting orders for its stool after the August show, and its first shipments were in March 1980, after this suit was filed. Defendant informed its sales representatives of the filing of this suit and told them to distinguish the Ever-Ready product from that of Black & Decker. The only evidence offered of any palming off by defendant was of two apparently isolated incidents in hardware stores in suburban Chicago. There is no evidence that defendant had anything to do with these incidents, or that these incidents were anything more than isolated incidents by independent retailers. Defendant's name and the trademark "Ready-Steps" are prominently displayed on both the stool itself and the carton in which it is sold.
The stools of plaintiff and defendant, as marketed, look remarkably similar. The geometry and structure of each are nearly identical. Both are sold exclusively in an almond color, the shades of which are only slightly different. Both include black trim featuresa plastic handle on the back of the top step, treads on the surfaces of the steps, and feet and caps on the frame members. Each has a latch on the right side of the top stepplaintiff's black and defendant's almond. Though there are slight differences between the two products, there is nothing which would significantly distinguish them in the eyes of a reasonable consumer.
There is absolutely no evidence that consumers associate the trade dress of the products with Black & Decker. In fact, plaintiff has not even attempted to prove secondary meaning.

CONCLUSIONS OF LAW
This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1332 and 1338.

Patent Validity
Defendant argues that the patent-in-suit is invalid due to its obviousness in light of prior art. 35 U.S.C. § 103 provides as follows:
A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.
*613 In a case such as this, the proper mode of analysis is clear. As stated in Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966),
Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.
35 U.S.C. § 282 provides that a patent is presumed valid, and that the burden of establishing invalidity rests on the party asserting it. See, also, Clark Equipment Co. v. Keller, 570 F.2d 778 (8th Cir. 1978); Farmhand, Inc. v. Lahman Mfg. Co., Inc., 568 F.2d 112 (8th Cir. 1978). The issuance of the patent is similar to an administrative decision recognizing its validity, and the presumption of validity is based on the acknowledged experience and expertise of the patent office in making that "administrative decision." American Seating Co. v. National Seating Co., 586 F.2d 611 (6th Cir. 1978).
In this case, however, the patent office did not consider the Henry Patent in its review of the prior art. The Henry Patent is more relevant to the patent-in-suit than the prior art considered by the patent office. The presumption of validity normally afforded to a patent is weakened, if not totally destroyed, by proof of pertinent prior art which was not considered. Ralston Purina Co. v. Gen. Foods Corp., 442 F.2d 389 (8th Cir. 1971); American Seating Co., supra; Smith v. Acme General Corporation, 614 F.2d 1086 (6th Cir. 1980).
The patent involved herein is a combination patentit combines old elements to get a new result. Sakraida v. Ag Pro, Inc., 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1970); Keller, supra; Reinke Mfg. Co., Inc. v. Sidney Mfg. Co., 594 F.2d 644 (8th Cir. 1979). Pin-and-slot connections and X-frames are old and well-known elements. Courts should scrutinize such patents with great care, in view of the difficulty and improbability of finding "invention" in an assembly of old elements. A & P Tea Co. v. Supermarket Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Sakraida, supra; Reinke, supra. An exacting standard of nonobviousness must be met. A & P Tea Co., supra.
Thus, in determining whether a patent which combines old and well-known elements meets the § 103 requirement of non-obviousness, one of the facts which the court must look for is synergism. In this respect, what is necessary is a determination that the combination of elements in the patent produces an effect greater than the sum of the several effects taken separately. Anderson's-Black Rock, Inc., supra; Sakraida, supra; Keller, supra. There must be some unusual or surprising results from the combination of the old elements. A & P Tea Co., supra.
Against this exacting standard, this Court can not conclude that the patent-in-suit is valid. As stated earlier, all the elements of the patent-in-suit were well-known in the prior art. Essentially, the only difference between the Henry Patent and the patent-in-suit is the addition of a second platform below the pivot of the X-frame, and the juggling of the geometry such that the rise and run are appropriate for a step stool. The thin-folding feature of the patent-in-suit is merely a matter of placing the pivots off-center with respect to the wider of the frames, the outer frame members, and using thin, sturdy materials, so that the protrusions from the inner frame members and steps are not sufficient to take them outside the planar volume of the outer frame members.
The patent-in-suit is a simple mechanical device using universally known elements and principles. The relevant prior art is therefore the field of mechanics itself. Skee-Trainer, Inc. v. Garelick Mfg. Co., 361 F.2d 895 (8th Cir. 1966); Maclaren v. B-I-W Group, Inc., 535 F.2d 1367 (2d Cir. 1976). The level of skill in this art is high. Even in the small subclass of this art involving *614 step stools and similar such devices, the level of skill is highSiff, Shaffer and Ribaudo are all highly skilled in the field, and there is no indication that they are not typical.
In view of the high level of skill in this art and the minimal differences between the prior art and the patent-in-suit, this Court believes the patent-in-suit is invalid as obvious. The patent-in-suit itself, in the specifications, says that "[t]he principles of the invention can, of course, be applied to stools with more than two steps." So too, this Court sees no reason why it would be nonobvious to apply the principles of Henry to a stool with more than one step.
Plaintiff argues that one should not look at an invention with hindsight and say it should have been obvious. That is, of course, true. But likewise, one should not say an invention was not obvious merely because it was not invented earlier. A delicate balance must be struck between these two extremes.
Plaintiff's stool has enjoyed commercial success and filled what was described as a long-felt need for a truly compact step stool. Though these factors may be relevant to a determination of obviousness, Graham, supra, these factors without "invention" will not suffice. A & P Tea Co., supra; Anderson's-Black Rock, Inc., supra.
This Court believes the patent-in-suit fails to meet the exacting burden laid down by the case law for combination patents. There simply is no synergism in plaintiff's device. Though plaintiff claims that the device satisfies this requirement due to the elimination of the jamming problem associated with pin-and-slot connections in the past, this Court can not agree. When opened in the normal manner, by lifting the front of the steps, the jamming problem persists. It is only when opened by lifting the lower brace on the inner frame members that the jamming problem is alleviated. But the Henry stool similarly does not jam when opened in this manner. As was said in A & P Tea Co., supra 340 U.S. at 153, 71 S.Ct. at 130, plaintiff's device "was a good idea, but scores of progressive ideas in business are not patentable."

Infringement
Even were this Court to conclude that the patent-in-suit is valid, defendant's step stool does not infringe the patent. The difference between plaintiff's stool and defendant's stool is that plaintiff's stool folds completely flat; defendant's does not. Though the difference is not great, this Court believes it is significant.
Defendant, of course, may not make slight, insignificant alterations on the patented device to avoid a finding of infringement. Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). As was said in Graver, id. at 607, 70 S.Ct. at 856:
But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room forindeed encouragethe unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent, which though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copy-righted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.
The courts will therefore prohibit a device which is substantially identical to the patented device with respect to the result attained, the means of aiming that result, and the manner in which its different parts *615 operate and cooperate to produce that result. Farmhand, Inc., supra; Graver, supra.
This Court has no doubt that defendant's stool is legally the equivalent of plaintiff's stool. They attain substantially the same result, and the means of attaining that result and the manner in which the parts operate are identical. This Court does not believe, however, that plaintiff may rely on the doctrine of equivalents to prohibit defendant's stool.
A patent must be construed in light of the file wrapper or prosecution history in the patent office. Graham, supra; Exhibit Supply Co. v. Ace Patents Corporation, 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942). Claims that have been narrowed in the patent office in order to obtain the issuance of a patent by distinguishing the prior art can not be widened in an infringement action to cover that which has previously been distinguished. Graham, supra; Westinghouse Electric Corp. v. Hanovia Chem. & Mfg. Co., 179 F.2d 293 (3rd Cir. 1949); Union Carbide & Carbon Corp. v. Graver Tank & Mfg. Co., 196 F.2d 103 (7th Cir.), cert. denied, 343 U.S. 967, 72 S.Ct. 1059, 96 L.Ed. 1363 (1952).
In this case, the applicants for the patent-in-suit never amended their claims in the patent office. Classic "file wrapper estoppel" is therefore not present. Duplan Corporation v. Deering Milliken, Inc., 379 F.Supp. 388 (D.S.C.1974); Welch v. General Motors Corporation, 330 F.Supp. 80 (E.D. Va.1970). They did, however, distinguish the prior art relied on by the examiner in his initial rejection of their claims when they argued for reconsideration. File wrapper estoppel applies equally to arguments before the patent office as to actual amendments of claims. Coleco Industries v. United States Intern., Etc., 573 F.2d 1247 (C.C.P.A.1978); American Seating Co. v. National Seating Co., 457 F.Supp. 444 (N.D. Ohio 1976), aff'd 586 F.2d 611 (6th Cir. 1978); Duplan Corporation, supra; Marston v. J. C. Penney Company, 324 F.Supp. 889 (E.D.Va.1971), aff'd 469 F.2d 694 (4th Cir. 1972); Welch, supra. A patentee, having argued a narrow construction for his claims before the patent office should be precluded from arguing a broader construction for purposes of infringement. Coleco Industries, supra.
That is exactly what plaintiff is attempting to do in this case. In the applicants' arguments for reconsideration, they distinguished the prior art on the ground that it could not be combined to meet the claim definition with respect to folding flat. Plaintiff now argues that defendant's stool infringes even though it does not fold flat. This plaintiff will not be allowed to do. This Court therefore believes that defendant's stool does not infringe plaintiff's patent.

Unfair Competition
Plaintiff claims that defendant has violated both § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and Missouri common law[2] by adopting a trade dress which is confusingly similar to the non-functional aspects of plaintiff's trade dress. Plaintiff asserts that the combination of the shape of the Stowaway step stool and its components, and the color and trim scheme of the stool, constitutes a protectable trade dress.
A cause of action is stated under § 43(a) of the Lanham Act when non-functional aspects of a product which have attained secondary meaning in the eyes of the public are duplicated by a competitor. Truck Equipment Serv. Co. v. Fruehauf Corp., 536 F.2d 1210 (8th Cir.), cert. denied, 429 U.S. 861 (1976) ("TESCO"); SK&F, Co. v. Premo Pharmaceutical Lab., 625 F.2d 1055 (3rd Cir. 1980); Fisher Stoves, Inc. v. All Nighter Stove Works, 626 F.2d 193 (1st Cir. 1980); Keebler Co. v. Rovira Biscuit *616 Corp., 624 F.2d 366 (1st Cir. 1980); Bose Corporation v. Linear Design Labs. Inc., 467 F.2d 304 (2d Cir. 1972). To prevail under this section, plaintiff must prove that the trade dress of the two stools is confusingly similar, that the features of the trade dress are primarily non-functional, and that the trade dress has attained secondary meaning. TESCO, supra; Keebler Co., supra.
As stated earlier, defendant's Ready-Steps step stool is substantially identical in appearance to plaintiff's Stowaway step stool. Though there are slight differences, this is "a situation where `the differences are less observable than the resemblances,' (Paris Medicine Co. v. W. H. Hill Co., 6 Cir., 102 F. 148, 150)." J. C. Penney Co. v. H. D. Lee Mercantile Co., 120 F.2d 949, 953 (8th Cir. 1941). The question is whether the two stools look the same in the eyes of the casual buyer, not whether the careful scrutiny of a discriminating purchaser might detect differences. J. C. Penney Co., supra; Ralston Purina Co. v. Checker Food Products Co., 80 S.W.2d 717 (Mo.App.1935). Despite the differences in detail between the two products, a purchaser of ordinary prudence would be induced by the marked resemblance in general effect to mistake one for the other. Ralston Purina Co., supra.
Nevertheless, this Court does not believe plaintiff may prevail under § 43(a). Plaintiff makes no claim that the trade dress of its stool has attained secondary meaning in the eyes of the purchasing public. Rather, plaintiff argues that its substantial advertising outlays have created "secondary meaning in the making," and that proof of actual secondary meaning is unnecessary. This Court can not agree.
Section 43(a) is meant to protect the public from confusion as to the source of the goods it is purchasing. Mortellito v. Nina of California, Inc., 335 F.Supp. 1288 (S.D.N. Y.1972); Miller Brewing Co. v. Falstaff Brewing Corp., 503 F.Supp. 896 (D.R.I. 1980). In the absence of secondary meaning, there will be no such confusion. When the trade dress of a product has attained secondary meaning, the purchasing public associates that trade dress with the producer of the product, not just with the product itself. Keebler Co., supra. If a competitor then copies that trade dress, the public is likely to believe that the competitor's product is also produced by the original producer. Id. In the absence of secondary meaning, however, there will be no such association in the minds of the purchasing public.
The cases cited by plaintiff for the proposition that secondary meaning in the making should be protected, Orion Pictures Co., Inc. v. Dell Pub. Co., Inc., 471 F.Supp. 392 (S.D.N.Y.1979); National Lampoon, Inc. v. American Broadcasting Co., Inc., 376 F.Supp. 733 (S.D.N.Y.1974); Blake Publishing Corp. v. O'Quinn Studios, Inc., 202 U.S. P.Q. 848 (S.D.N.Y.1979), are not persuasive. In each case, the court found that there actually was secondary meaning, and the proposition that secondary meaning in the making might also be protectable was only dicta. Plaintiff has cited no case which actually protected secondary meaning in the making, or which discussed how much evidence would be necessary to prove secondary meaning in the making. The clear weight of authority is that a showing of secondary meaning is necessary to prevail under § 43(a). Keebler Co., supra; Major Pool Equipment Corp. v. Ideal Pool Corp., 203 U.S.P.Q. 577 (N.D.Ga.1979); Miller Brewing Co., supra; TESCO, supra; Price Food Company v. Good Foods, Inc., 400 F.2d 662 (6th Cir. 1968); Joshua Meier Company v. Albany Novelty Mfg. Co., 236 F.2d 144 (2d Cir. 1956); Sylvania Electric Products v. Dura Electric Lamp Company, 247 F.2d 730 (3rd Cir. 1957).
Some cases have held that deliberate copying of a competitor's product or deliberate palming off of one's product as that of a competitor may give rise to an inference of secondary meaning. TESCO, supra; National Lampoon, Inc., supra; Fotomat Corp. v. Cochran, 437 F.Supp. 1231 (D.Kan. 1977); Mortellito, supra. In this case, however, plaintiff has proven neither deliberate copying nor palming off. At most, plaintiff has shown a few isolated instances of independent retailers advertising plaintiff's product at a sale price and selling both *617 plaintiff's and defendant's products at that price. That is far from proving that defendant has palmed its product off as that of plaintiff. Swank, Inc. v. Anson, Inc., 196 F.2d 330 (1st Cir. 1952). In fact, the evidence established that defendant instructed its sales representatives to clearly distinguish its product from plaintiff's stool. In any event, any inference of secondary meaning which might have arisen was clearly rebuttedplaintiff itself admitted there was no secondary meaning.
This Court also believes plaintiff has failed to show that the trade dress of its stool is primarily non-functional. Though it is the overall design of plaintiff's stool which is allegedly distinctive, the individual components thereof must be looked at to see if they are primarily non-functional. TESCO, supra. This Court does not believe they are.
The primary features in this regard are the geometry of the stool, the square and rectangular shapes of the legs, the color of the stool, and the trim features and their color. As to the geometry of the stool, it is obvious that it is primarily functional. It is the relationship between the components which makes the stool what it is. Likewise the square and rectangular shape of the legs are primarily functional. Though plaintiff argues that defendant could have used round legs, defendant has shown that round legs would have been less practical. Once square and rectangular legs are decided upon, all such legs will look virtually the same, even if they are of different sizes, as defendant's and plaintiff's inner legs are.
Defendant picked the color almond for the same reason plaintiff did soit was the most popular color for kitchen accessories. Since this color contributes to the consumer acceptance of the product, it is functional. J. C. Penney Co., supra. Finally, this Court believes the trim features and the color thereof are primarily functional. The color black is the most likely to be chosen for trim features such as treads, leg caps, and handles. Black doesn't show dirt, and that is clearly a primary consideration in choosing a color for the treads which people step on, for example. The color of the trim features is therefore functional. The trim features themselves are also functional. Plaintiff's own advertising promotes the usefulness of these features. Cf. Fisher Stoves, Inc., supra.
This Court therefore believes that defendant must prevail on plaintiff's claim under § 43(a) of the Lanham Act. Plaintiff has not separately argued its common law unfair competition claim, and has not suggested that it protects any more than that protected by the Lanham Act. Missouri generally follows the general principles of unfair competition expressed in the Lanham Act. Bass Buster, Inc. v. Gapen Mfg. Co., Inc., 420 F.Supp. 144 (W.D.Mo.1976). What has been said in disposing of plaintiff's § 43(a) claim therefore applies equally to its common law unfair competition claim. To the extent that Missouri law might be more expansive, defendant has fully complied with that law by clearly and prominently labeling its product and the cartons in which the product is sold. Id.; Ralston Purina Co., supra; J. C. Penney Co., supra.

CONCLUSION
Judgment will therefore be entered for defendant on all counts, and plaintiff's patent will be declared invalid. While plaintiff argues that to allow defendant to sell its stool is unfair and a blow to fair competition in the marketplace, this Court can not agree. While defendant's conduct may seem "unfair" to plaintiff, whose sales are obviously affected, what is "fair" or "unfair" is clearly in the eyes of the beholder. What was said in Fisher Stove, Inc., supra at 196, is equally applicable here:
Plaintiff designed a stove with several functional innovations. These were enthusiastically received in the marketplace. Defendant, in imitating them, is doubtless sharing in the market formerly captured by plaintiff's skill and judgment. While we sympathize with plaintiff's disappointment at losing sales to an imitator, this is a fact of business life.
See, also, Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938).
*618 Defendant's request for attorneys' fees will be denied.
NOTES
[1] "While it is not by any means a crucial issue as regards patentability, it is simply mentioned in passing that even the basic reference fails to meet a unique feature of Applicant's claimed construction, viz., the "step" (seat member 13) does not lie within the volume defined by the folded crosslegs; this is obvious from Fig. 5."
[2] Plaintiff never specifically asserts which state's law it is proceeding under with respect to its claim of common law unfair competition. Since defendant's action occurred in Missouri, this Court will apply the Missouri law of unfair competition. Audio Fidelity, Inc. v. High Fidelity Recordings, Inc., 283 F.2d 551 (9th Cir. 1960); Data Cash Systems, Inc. v. JS&A Group, Inc., 480 F.Supp. 1063 (N.D.Ill.1979).